## WISEMAN *v.* UNITED DAIRIES, INC.

1. FRAUDS, STATUTE OF—DEBTS OF ANOTHER—SUPERSEDING WRITTEN CONTRACT.

    Trustee's claim that transferee of stock of bankrupt corporation had expressly assumed and agreed to pay the debts of the corporation is not sustainable under evidence showing such agreement rested in parol, a verbal understanding, hence, was void under the statute of frauds, and because it was superseded by written contracts (3 Comp. Laws 1929, § 13417).

2. SAME—ASSUMPTION OF DEBTS—EVIDENCE.

    Recital of sales agreement relating to sale of corporate stock that the debts of the corporation were warranted as not being more than a stated sum did not constitute an implied promise

REFERENCES FOR POINTS IN HEADNOTES

[1] 49 Am. Jur., Statute of Frauds, § 60.
[5] 13 Am. Jur., Corporations, § 1001.
[5, 8–10] Validity of contract between corporations as affected by directors or officers in common. 114 A.L R. 299, 311.
[6] 13 Am. Jur., Corporations, § 989.
[7] 24 Am. Jur., Fraudulent Conveyances, § 12.
[8–10] 13 Am. Jur., Corporations, § 1000; 24 Am. Jur., Fraudulent Conveyances, § 20.

on the part of the purchaser to pay such debts (3 Comp. Laws 1929, § 13417).

3. VENDOR AND PURCHASER—PURCHASER'S AGREEMENT TO OBTAIN SURETIES' RELEASE—ASSUMPTION OF DEBTS OF ANOTHER.

A purchaser's obligation to obtain release of the creditor as to the personal liability of the sellers of corporate stock and the owners of the real estate on which the corporation was located and doing business and to obtain a release of the mortgage on the real estate given as security for payment of obligation of the corporation to such creditor did not constitute an undertaking to pay the obligation itself but merely to relieve the sureties or guarantors of their obligation to do so (3 Comp. Laws 1929, § 13417).

4. FRAUDULENT CONVEYANCES—CHATTEL MORTGAGE BY CORPORATE PURCHASER'S SUBSIDIARY.

Where corporate purchaser of stock of now bankrupt corporation caused latter to execute a chattel mortgage to purchaser containing harsh terms and then foreclosed the mortgage, conclusion is required that purchaser sought to obtain assets of bankrupt at forced sale figures.

5. CORPORATIONS—INTERCORPORATE DEALINGS—BURDEN OF SHOWING FAIR DEALING.

While the directors of one corporation may also lawfully act as the directors of another, when there are intercorporate dealings, the burden is on the common directors to prove they acted fairly in the interests of corporation whose action is questioned (3 Comp. Laws 1948, § 450.13).

6. SAME—OBLIGATION OF DIRECTORS.

The directors of a corporation are required to safeguard, care for and promote the interests of the corporation.

7. FRAUDULENT CONVEYANCES—ACTUAL INTENT—EVIDENCE.

The only method of determining "actual intent" in a suit to set aside a transaction alleged to have been with actual intent to hinder, delay or defraud present or future creditors is by a consideration of the circumstances surrounding the transaction.

8. SAME—CHATTEL MORTGAGES—DERELICTION OF DIRECTORS—FRAUD—EVIDENCE.

Where chattel mortgage given by creamery corporation, now bankrupt; to corporate purchaser of all of its stock was on such harsh terms as to leave mortgagor without working capital, and such harsh terms appear to have been unnecessary under

the circumstances, the directors of the mortgagor were derelict in their duty toward it, especially where they were directors also, of the purchasing corporation and, where the entire transaction resulted in the purchaser's acquisition of the assets of the creamery corporation at less than 50 per cent. of their true value, it constituted a fraud on the rights of the creditors of the bankrupt, hence the chattel mortgage was void for fraud and the foreclosure sale also was void and ineffectual to pass title.

9. SAME—ACCOUNTING—INTEREST—CREDITS—LOSSES.

Where corporate purchaser of stock of creamery corporation, now bankrupt, and the common directors of both corporations caused to be executed a chattel mortgage which was shortly thereafter foreclosed and resulted in such a fraud to the creamery corporation and its creditors as to be held void in suit by trustee in bankruptcy to set aside such transaction, the purchasing corporation and the directors are directed to account for all listed and unlisted assets of creamery corporation with legal interest from date mortgage was executed, less cash payment then made to a hitherto secured creditor, to date accounting is had but without credit for any loss in conducting the creamery corporation's business.

10. CORPORATIONS—GOING CONCERN—DOMINATION OF SUBSIDIARY BY PARENT CORPORATION.

Claim that creamery corporation was a "going concern" for period which elapsed between the date when it gave a chattel mortgage, containing very harsh terms, to defendant corporation which had recently theretofore purchased the entire capital stock thereof and installed its own directors as directors of the mortgagor, and date of foreclosure sale under such mortgage *held,* incorrect where it appears the mortgagee was in actual operation of the mortgagor's business and commingled the milk received from the mortgagor's supplier with the milk received for the mortgagee's other business.

11. PLEADING—ADMISSION—DEFAULT.

Where bill filed by trustee in bankruptcy for creamery corporation alleged that real estate involved in transaction was actually an asset of the corporation although standing in the name of two defendants who had owned all of the stock, such allegation is deemed admitted where such defendants were later defaulted, hence such defendants were liable to plaintiff for amount received for such real estate.

12. FRAUDULENT CONVEYANCES—PARTIES TO FRAUD.

Bill by trustee in bankruptcy for creamery corporation to set aside certain transfers and conveyances on ground of fraud was properly dismissed as to secured creditor of such corporation where it does not appear to have participated in the fraud.

13. SAME—ACCOUNTING—NOTICE—INTEREST—EXPENSES OF TRUSTEE IN BANKRUPTCY.

Where trustee in bankruptcy is found entitled to an accounting by transferee corporation of bankrupt's assets and the corporation's directors and case is remanded to trial court for such purpose, creditors of bankrupt are entitled to notice of the accounting and liability to them satisfied by payment of all creditors of the bankrupt as of the date of the transfer of assets plus legal interest from such date plus trustee's reasonable expenses respecting enforcement of and obtaining payment of such creditors.

BUTZEL and BUSHNELL, JJ., dissenting in part.

Appeal from Wayne; Maher (Thomas F.), J. Submitted January 11, 1949. (Docket No. 77, Calendar No. 44,314.) Decided April 12, 1949. Rehearing denied May 18, 1949.

Bill by Walter G. Wiseman, trustee in bankruptcy of Belrose Creamery Company, a Michigan corporation, against United Dairies, Inc., a Michigan corporation, Michigan Milk Producers Association, a Michigan corporation, Abraham Rosen, Joseph Blifeld, George L. Kayes, Morris Gurvitch, Ed Gornbein, Israel Sokonoff, David Shwedel and Max Weiss to set aside certain transfers of property and for an accounting. Bill dismissed. Plaintiff appeals. Affirmed as to defendants Michigan Milk Producers Association and Kayes, reversed as to all

other defendants and remanded for accounting in accordance with opinion.

*Kahn, Oldani & Kahn,* for plaintiff.

*Berger, Manason & Kayes* (*Sol J. Schwartz,* of counsel), for defendants.

REID, J. Plaintiff trustee in bankruptcy filed his bill of complaint in this case to obtain a determination and decree (a) that certain transfers and conveyances made by the bankrupt corporation, Belrose Creamery Company, are fraudulent and void, (b) that the Belrose Creamery Company made a fraudulent preference of a creditor within the meaning of the bankruptcy act of 1938, as amended, (c) for an accounting to establish liability of defendants, and (d) that defe⁻dants be required to turn over to plaintiff remaining assets of the bankrupt corporation or in lieu thereof, to account for the value of the same. The trial court dismissed the bill. Plaintiff appeals.

The bankrupt corporation, Belrose Creamery Company, is hereinafter referred to as Belrose. The defendant United Dairies, Inc., a Michigan corporation, is hereinafter referred to as United. Defendant Michigan Milk Producers Association is hereinafter referred to as Producers.

Belrose was in the creamery business at 7426 Fenkell avenue, Detroit, Michigan. The total stock of the Belrose corporation was 25,000 shares, of which defendants Rosen and Blifeld each owned half. Belrose conveyed the land and building where Belrose did business at 7426 Fenkell avenue to defendants Rosen and Blifeld by warranty deed, November 1, 1940, which deed was recorded, January 17, 1941.

On February 1, 1943, Belrose gave a mortgage on said real estate to defendant Michigan Milk Producers Association as security for future credit to be extended. The mortgage warranted title in Belrose but Belrose did not have paper title. The paper title was in defendants Blifeld and Rosen.

On the date of the giving of the real estate mortgage, February 1, 1943, Belrose gave defendant Producers a chattel mortgage on some of its personal property, which was also to secure future advances. Blifeld and Rosen executed a personal guarantee of the debt to Producers, representing among other things that they were the owners of certain trucks, routes, stops, points and good will.

Defendant Shwedel, secretary and director of United (after December 16, 1943, director also of Belrose), testified,

"The negotiations between United Dairies and Blifeld and Rosen to buy the assets of Belrose Creamery started about 2 years before the deal took place.

"United Dairies wanted the Belrose Creamery because, first of all, we were crowded at the United Dairies. We figured we were going to move our ice cream department and also move our complete retail department to relieve the congestion in the creamery.

"The building in which the Belrose Creamery was operating was a very satisfactory location for a creamery and a very valuable building. There was lots of room in it. They had a room there for the retail business. Retail business covers the milk that was sold from house to house as distinguished from milk that is sold to restaurants and hotels and the like, such as confectionery stores.

"That is where the milk was bottled and put on the trucks for house-to-house delivery. That is where it was pasteurized. They had enough space for that.

"I don't know whether at one time, along about 1940, the Belrose Corporation owned the building. We were negotiating to buy the complete operation, the building and the business. We wanted both. * * * Back in 1943, business was good; milk was hard to get and every creamery was going good."

There is no testimony disputing that the balance sheet of Belrose as of November 30, 1943, showed a net worth of at least $7,910.08, in accordance with the testimony of Mr. Shaer, accountant for Belrose. According to exhibit No. 3, the statement prepared as of December 15, 1943, by plaintiff Wiseman, then acting as accountant for Belrose, there was substantially, at least, an equal net worth without including "points," apparently. The accuracy of exhibit No. 3 prepared by Wiseman is not challenged by any testimony.

On December 15, 1943, two written agreements were signed by United on the one side and Rosen and Blifeld on the other, covering the sale of the stock of Belrose and real estate where the business of Belrose was conducted, to United. The agreements, exhibits Nos. 4 and 5, are as follows:

## Exhibit No. 4

"Articles of Agreement entered into this 15th day of December, 1943, between Abraham Rosen and Joseph Blifeld, hereinafter designated as 'sellers' and United Dairies, Inc., a Michigan corporation, hereinafter designated as 'purchaser,'

"Witnesseth:

"Whereas, the sellers are the owners of real estate hereinafter described, and the owners of each and every share of the issued corporate stock of Belrose Creamery Company, a Michigan corporation, being owners respectively of the number of shares set opposite their names:

Abraham Rosen 12,500 Shares

Joseph Blifeld 12,500 Shares;

and

"Whereas, the sellers are officers and directors of said Belrose Creamery Company, and are actively engaged in said business; and

"Whereas, the sellers desire to sell and the purchaser desires to purchase their real estate and said corporate shares;

"Now Therefore, It Is Agreed as Follows:

"1. The sellers, individually and jointly, agree to sell, and the purchaser agrees to purchase, the following:

"(a) 25,000 shares of the corporate stock of Belrose Creamery Company;

"(b) Real estate described as follows:

"Lots 81, 82, 83, and 84, Mulberry-Hill subdivision of south $\frac{1}{2}$ of south $\frac{1}{2}$ of southeast $\frac{1}{4}$ of section 16, town 1 south, range 11 east, Greenfield township, Wayne county, Michigan,

"which said real estate is to be conveyed upon a land contract between the parties hereto, as is more specifically hereinafter set forth.

"2. The purchase price for the said corporate shares and real estate is $17,500, payable as follows:

"$10,000 upon the execution hereof and the various documents required to consummate this transaction, receipt whereof is hereby acknowledged;

"The balance of $7,500 in accordance with the terms of a land contract, which contract has been executed simultaneously herewith, and which contract provides for payments at the rate of $550 per month, commencing on the first day of February, 1944, and on the first day of each and every month thereafter until paid, together with interest as hereinafter set forth, namely, 6 per cent., per annum, with the understanding of the parties being that only so much interest shall be paid and required to be paid as is necessary for payment by the vendors herein as interest on the mortgage held by Ralph Weisman, the balance on which mortgage is in the

sum of $3,000, which sum is included in the above mentioned $7,500.

"The purchaser acknowledges receipt of certificates representing all of the shares of the corporate stock of Belrose Creamery Company herein being conveyed, which said certificates have been indorsed over by the sellers individually, as the owners thereof.

"3. Sellers do hereby warrant that they are the owners of all of the issued corporate stock of BELROSE CREAMERY COMPANY, and that the shares herein being conveyed represent the total of said issued stock.

"4. The parties hereto have joined in the preparation of an inventory of all of the assets of every nature and description owned by BELROSE CREAMERY COMPANY, which said inventory as scheduled is attached hereto, and the sellers do hereby warrant that the corporation is the owner of each and every item of asset listed in said schedule; that said assets are free and clear of all liens and encumbrances except:

"(a) Mortgage to the Michigan Milk Producers Association;

"(b) Mortgage to Ralph Weisman.

"5. The sellers warrant that the total indebtedness of the corporation of every nature and description, plus the indebtednesses which are liens against the said described real estate, including the Weisman mortgage as aforesaid, does not exceed the sum of $42,000 as of the close of business on December 15, 1943, it being understood however, that liability for milk and cream incurred on the 14th and 15th days of December, 1943 shall not be included in computing the total indebtedness of the corporation and the individuals as hereinbefore set forth, and shall be excluded from any consideration whatsoever. It is understood and agreed that in the event the indebtedness, as aforesaid, exceeds said amount as of December 15, 1943, that the overage, when same shall have been computed, shall be deducted

from the principal balance due on said land contract, without affecting, however, the monthly payments due on said land contract balance as then determined. In the event the overage exceeds the then existing balance on said land contract, the said sellers will individually and jointly forthwith pay said amount to the purchaser, except as hereinafter provided.

"In the event it shall become apparent within 90 days from the date hereof that the aforementioned list of creditors and the amount due them is incorrect, then the sellers agree that any claim filed by any creditor other than those listed as aforesaid, for which it shall be finally determined that BELROSE CREAMERY COMPANY is liable, may be deducted from the balance due the sellers on the aforementioned land contract. Any such claim however, if filed, shall be submitted to the sellers before payment thereof, who shall have the right to contest same to a final judicial determination of the liability of BELROSE CREAMERY COMPANY.

"6. All goods, wares, and merchandise purchased by and/or billed to BELROSE CREAMERY COMPANY but not received by BELROSE CREAMERY COMPANY, by December 15, 1943, are not to be included in, or considered as liabilities of BELROSE CREAMERY COMPANY, in any shape, form, or manner whatsoever, and not to be considered under the terms of paragraph 5 herein.

"7. The sellers do hereby warrant that no agreement exists by and between the BELROSE CREAMERY COMPANY, a Michigan corporation, and the sellers individually by way of employment or covering any other subject matter, and that no employee, officer, or agent has any contract with said BELROSE CREAMERY COMPANY, a Michigan corporation, which cannot be terminated forthwith without liabilities for damages, except existing contracts with the C.I.O.

"8. The sellers are herewith delivering to the purchaser a certified statement of the financial status of BELROSE CREAMERY COMPANY as of November 30,

1943, and warrant the correctness thereof, and agree that they will, within 30 days from date hereof, deliver to the purchaser a certified copy of statement showing financial status of BELROSE CREAMERY COMPANY as of the close of business on December 15, 1943, in accordance with paragraph 5.

"9. The sellers have herewith resigned as officers and directors of BELROSE CREAMERY COMPANY and do herewith deliver said resignations and the resignation of each and every other officer and director of BELROSE CREAMERY COMPANY.

"10. The purchaser agrees that it will, simultaneously with the execution hereof, and the delivery of documents required to consummate this transaction, secure from the Michigan Milk Producers Association a release to the sellers herein of their personal liability to the Michigan Milk Producers Association, and a release of the mortgage on the real estate herein described.

"11. The sellers herein do further agree individually and collectively not to engage, for a period of 5 years from and after December 15, 1943, in the dairy or creamery business, or in the sale of dairy products, retail or wholesale, in the county of Wayne and State of Michigan, or the county of Oakland, State of Michigan, either directly or indirectly, or through a member of their family, for themselves or their agents, or as servants of or employees of any other person, firm, or corporation, nor will they advise or counsel anybody else to so engage or to be engaged in said dairy or creamery business, nor will the said sellers finance or loan, directly or indirectly, money to any individual, partnership, firm, or corporation, engaged or to be engaged in the dairy business, within the time limited as aforesaid and within the confines of the areas as herein set forth.

"IN WITNESS WHEREOF the parties hereto have hereunto set their hands and seals the day and year first above written."

Exhibit No. 5

"AGREEMENT

"THIS AGREEMENT entered into this 15th day of December, 1943, between UNITED DAIRIES, INC., a Michigan corporation, hereinafter referred to as 'party of the first part,' and ABRAHAM ROSEN and JOSEPH BLIFELD, hereinafter referred to as 'parties of the second part,'

"WITNESSETH:

"WHEREAS, Parties of the second part have sold to the party of the first part certain corporate shares of stock of BELROSE CREAMERY COMPANY, a Michigan corporation, and real estate in the city of Detroit; and

"WHEREAS, it is the intention of the parties that the party of the first part will reimburse, hold harmless and indemnify the parties of the second part if they are personally liable under certain circumstances;

"Now THEREFORE, and as an additional consideration for the entry of the aforementioned agreement and for the sale of said stock,

"IT IS MUTUALLY AGREED by and between the parties as follows:

"1. Should any creditor or creditors of the BELROSE CREAMERY COMPANY make any claim or institute any proceedings in law or in equity to recover any sums or sums of money from the parties of the second part by virtue of their having been directors of the BELROSE CREAMERY COMPANY, which claim or action is predicated upon, or arising as a result of the alleged failure of the officers and directors of the BELROSE CREAMERY COMPANY to file its annual report with the corporation and securities commission for the State of Michigan in accordance with the statute in such case made and provided, then the party of the first part agrees to save and hold harmless the parties of the second part from the payment of such claim and reimburse and indemnify the parties of

the second part should they be forced to pay said claim;

"2. In the event DEALERS DAIRY presents any claim against parties of the second part arising from personal liability on any note or obligation and/or upon any mortgage, whether recorded or unrecorded, then the party of the first part agrees to save and hold harmless the parties of the second part from the payment of such claim and to reimburse and indemnify the parties of the second part should they be forced to pay said claim;

"3. BELROSE CREAMERY COMPANY has heretofore received from its drivers, bonds in the approximately sum of $1,100. Party of the first part agrees to save and hold harmless the parties of the second part from the personal payment of such claim and to reimburse and indemnify the parties of the second part should they be forced to pay such claim;

"4. BELROSE CREAMERY COMPANY is liable to the United States government under the withholding tax in the approximate sum of $1,500. Party of the first part agrees to save and hold harmless the parties of the second part from the personal payment of such claim and to reimburse and indemnify the parties of the second part should they be forced to pay said claim;

"5. Party of the first part acknowledges that among the assets of BELROSE CREAMERY COMPANY, as of this date, are two items earmarked for specific purposes:

"(a) The approximate sum of $1,100 as drivers' bonds;

"(b) The approximate sum of $1,500 withholding tax due to the United States government;

"6. Party of the first part shall have the right to contest any claim on behalf of the parties of the second part covered by this agreement to a final judicial determination by the Supreme Court, and the party of the first part shall have the right to select and employ counsel of its own choosing to represent said parties of the second part in said ac-

tion.  The cost and expense of said unit shall be borne by the party of the first part.  Parties of the second part shall fully cooperate with the party of the first part in the defense of said action;

"In Witness Whereof the parties hereto have hereunto set their hands and seals the day and year first above written."

Contemporaneously with exhibits Nos. 4 and 5, Belrose executed to United a chattel mortgage dated and recorded December 16, 1943.

Upon the execution of the contracts, exhibits Nos. 4 and 5, Blifeld and Rosen severed their relations with Belrose and had no further control over the assets of Belrose.

Howard F. Simons testified that he was secretary and general manager of Producers and had held that position approximately 6 years and was such officer during December, 1943, and testified that Producers extended Belrose 15 days' credit.  His testimony was as follows:

"The bills that were current between the first and fifteenth became due on the first of the following month.  The bills that were incurred between the fifteenth and the last of the month were payable the fifteenth of the following month.  This 15-day credit represented approximately $7,000.  It amounted to that much in approximately 2 weeks.  When the deal was closed on December 16th, we were paid a little over $14,000 in a check from Belrose Creamery. That represented the last 2 weeks and the amount of money owing for the first 2 weeks of the month. It was the money owing for 30 days.  It was about $7,000 in 2 weeks.  *  *  *  The account was not past due—it never was.  They were a good account. Under the circumstances, there was no reason for shutting them off or being disturbed about their account."

Simons further testified on redirect examination:

"United Dairies guaranteed the account for all shipments made to Belrose after we were paid off in full on December 15, 1943. Milk was rationed at that time, during the war. There was a quota system. Belrose Creamery did not have a quota with us; it was with the United States government. If we were running close to the requirements of the market, then we allocated milk in accordance with the government quota. The business that a creamery was able to do would depend entirely upon its quota, I suppose, unless they had in some manner lost business since the quota was established. There might be some latitude there. They could not grow. That was the purpose of the government's quota, so they could not sell any more. I suppose it was for that reason the quota allowances of milk were very valuable. As to whether a creamery could not start in business at that time because they did not have any quota, I suppose that is right.  *   *   *

"*Q.* They were buying independently of Belrose, weren't they?

"*A.* So far as we are concerned, the orders came for so many cans of milk.

"*Q.* For United Dairies?

"*A.* That is right. What they did with it, we had no knowledge.

"*Q.* You did not make a separation between milk going to Belrose and milk going to United Dairies?

"*A.* That is right.

"*Q.* It was all United Dairies?

"*A.* That is right.

"*Q.* And United Dairies paid you all of it?

"*A.* That is right.

"*Q.* Did you get any Belrose checks for milk after December 16, 1943?

"*A.* No, sir.

"*Q.* It was all United Dairies checks?

"*A.* That is right."

Mr. Simons testified on recross-examination:

"The fact that Mr. Rosen and Mr. Blifeld owned the routes themselves individually very decidedy had something to do with our determination in deciding to put Belrose on a 2-weeks' credit instead of a month's credit, as is customary. The reason was that if they owned the routes, they could have taken routes anywhere; they could have sold them. That is the valuable part of the creamery business. That would have left the corporation high and dry without any points or any routes."

Defendant Max Weiss testified:

"*Q.* The United bought the supplies from Michigan Milk Producers Association for the Belrose routes?

"*A.* That is right. We had it billed to United Dairies.

"*Q.* And you paid it?

"*A.* Yes."

United by its purchase agreement, exhibit No. 4, was obligated to obtain the release of vendors Blifeld and Rosen of their personal liability to Producers and a release of the mortgage on the real estate owned by vendors Blifeld and Rosen and sold to United. To discharge such obligation to procure the release of vendors Blifeld and Rosen of their personal liability, United loaned to Belrose $14,150 and with that money Belrose paid the obligation to Producers and obtained a release and discharge of the chattel mortgage held by Producers.

Upon the execution of exhibits Nos. 4 and 5, the vendor defendants Blifeld and Rosen resigned as directors of Belrose and defendants Morris Gurvitch, Ed Gornbein, Israel Sokonoff, David Shwedel and Max Weiss, who were the directors of United at that time, became the directors of Belrose, also, and

thereupon United immediately seized all the assets of Belrose.

Attorneys for 2 creditors of Belrose, together with 4 or 5 others, upon hearing of the transfer to United, urged upon Belrose the payment of their clients' obligations, threatening suit if unpaid, but did not threaten bankruptcy proceedings. This action of creditors was seized upon by United as a pretext for claiming that there was a threat to the business of the company and on Friday, December 21st, 5 days after the giving of the chattel mortgage by Belrose to United, United declared the mortgage in default because of the nonpayment of the instalment then due, and posted notices of foreclosure sale. It does not appear that the directors of United in their capacity as directors of Belrose made any effort to pay the instalment that had become in default.

Defendant directors of Belrose filed a petition on December 21, 1943, for the dissolution of the corporation and plaintiff Walter G. Wiseman was appointed temporary receiver of Belrose by the Wayne circuit court in chancery. However, the assets of Belrose remained in possession of United, which had seized the assets, December 16, 1943.

United's answer admits that United seized the assets, December 16, 1943. Wiseman, who was then working on the books of Belrose as an accountant, testified United took Belrose's assets on or about December 15, 1943. No assets came into the possession of plaintiff as receiver, nor later as trustee in bankruptcy. The foreclosure sale was held, January 26, 1944. At that sale Vincent Dacey, attorney for a creditor of Belrose, announced that anybody who bought any assets would take them subject to a lot of litigation that he intended to start. Nobody but United bid at the sale and the entire assets of

Belrose were sold for $15,000 to United. The unsecured claims amounted to about $21,501.40.

Plaintiff claims that United expressly assumed and agreed to pay the debts of Belrose. With this claim we are not in accord because (1) proof thereof depending upon the testimony of witness Shaer amounted only to proof that the agreement rested in parol, a verbal undertaking; not being in writing, it was void under the statute of frauds;* (2) the verbal statement on the part of Weiss that United would "take care of the creditors," preceded the written agreements, exhibits Nos. 4 and 5, and the other documents evidencing conveyance of property rights, hence was superseded by the written contracts; therefore, the verbal undertaking is not to be considered as any part of the agreement of the parties:

Plaintiff further claims, as to the sales agreement, exhibit No. 4, that because of the recital that the sellers warrant the total indebtedness of Belrose not to exceed $42,000, and because of other language in the exhibit, there exists an implied promise on the part of United to pay the debts of the corporation, with which theory, also, we are not in accord. The recital of the amount of debt is merely to be construed as a warranty to the purchasers of the stock of an important matter bearing upon the value of the stock and there was no implied undertaking to pay the debts.

Plaintiff further claims that paragraph 10 of exhibit No. 4 amounts to an agreement that United would pay the obligations of Belrose to Producers, with which claim, also, we are not in accord, for the reason that the undertaking in question in paragraph 10 is merely an undertaking to relieve the

---

* See 3 Comp. Laws 1929, § 13417, as amended by Act No. 261, Pub Acts 1945 (3 Comp. Laws 1948, § 566.132 [Stat. Ann. 1947 Cum. Supp. § 26.922]).—Reporter.

sureties or guarantors of the obligation and not to pay the obligation itself. Further, the undertaking to procure release of the mortgage on the real estate is similarly to be construed, namely, to procure the release of real estate in which Belrose was not interested, the fulfillment of which obligation merely required in effect that Blifeld and Rosen satisfy Producers with some other sort of guarantee or security.

Plaintiff further claims that Belrose and the creditors of Belrose were defrauded in the matter of giving a chattel mortgage to United, December 16, 1943, and subsequent default and foreclosure thereof.

It is to be borne in mind that it is conceded and proven on this record that the creamery business at the time in question was a paying business and that a creamery could sell all the milk that it could obtain under any quota.

Producers had not urged Belrose to pay off its debt to Producers, nor sought to close out the line of credit. The directors of United, acting in their capacity as directors of Belrose, caused that a chattel mortgage be given to United with harsher and shorter terms than contained in Producers' chattel mortgage. In the chattel mortgage to United among other things it is recited that Belrose is to pay "the total sum due to it [United] for all purchases made by Belrose Creamery Company from the said United Dairies, Inc., as follows: On or before Monday of each week, all purchases made during the preceding week," instead of the 15-day credit period theretofore existing. This weekly payment was to be in addition to paying a weekly payment of $400 on the debt of $14,150, plus interest.

By the chattel mortgage given by Belrose to United there was included,

"Each and every item of personal property and 'points' of business now owned or which may hereafter be owned by said Belrose Creamery Company, and that the failure to include any such item in the schedule appended hereto shall in nowise affect the lien of United Dairies, Inc., upon said items so omitted."

It is a fair inference from the testimony that the action of United on December 16th in taking over the assets of Belrose, including handling the purchases from Producers and having shipment of milk to the Belrose plant charged to and paid by United, would give at least Producers, one creditor, and that a principal creditor, to understand that the business of Belrose had been taken over by United, and that Belrose had practically ceased to exist as a going concern. It is a fair inference from the testimony in the case that the unsecured creditors of Belrose became alarmed at the actions of United and began to urge payment.

United had bought out other creameries preceding the matter with Belrose, was well informed of the details and matters connected with the creamery business in the area of Detroit, had taken extraordinary pains to assure itself in detail of the affairs of Belrose, during 2 years' negotiations, had participated in the preparation of the inventory attached to the sales agreement, exhibit No. 4, and desired the use of the real estate at 7426 Fenkell for a processing and retail sales stand and for the carrying on of ice cream business.

We conclude from all the testimony in this case that United, acting through its directors, who were also directors of Belrose, purposely brought about a situation where Belrose was unable to protect itself against the demands of its creditors, to insure itself credit or to continue for itself the conduct of its business, all for the purpose on the part of

United of acquiring the property of Belrose at forced sale figures and defrauding the creditors of Belrose. The directors of United could also lawfully act as directors of Belrose. The burden is on the directors of Belrose to prove that they acted fairly in the interests of Belrose. See 3 Comp. Laws 1948, § 450.13 (Stat. Ann. 1947 Cum. Supp. § 21.13), subd. 5 of which is as follows:

"No contract of any corporation made with any director of such corporation or with a partnership or other group or association of which any such director shall be a member or with any other corporation of which such director may be a member or director and no contract between corporations having common directors shall be invalid because of such respective facts alone. When the validity of any such contract is questioned, the burden of proving the fairness to the contracting parties of any such contract shall be upon such director, partnership, other group or association, or corporation who shall be asserting the validity of such contract."

The directors of Belrose were required to safeguard, care for and promote the interests of Belrose, in respect of which duty they became derelict and delinquent. The directors of Belrose acted in the interests of United. It does not appear that Producers would have required or insisted on so harsh terms as were incorporated into the chattel mortgage given United on December 16th, the foreclosure of which wiped out all of Belrose's assets.

"In a suit to set aside a conveyance of land alleged to have been made with actual intent to hinder, delay or fraud present or future creditors, the only method of determining actual intent is by a consideration of the circumstances surrounding the transaction." *Bentley* v. *Caille* (syllabus 2), 289 Mich. 74.

No assets of Belrose, not even cash, were omitted from the chattel mortgage to United. Not even accounts receivable were reserved from which some small working capital might be obtained. After the giving of such chattel mortgage, Belrose could not continue normal operations nor even use its ready cash to pay current expenses nor sell even its perishable property, without United's written consent.

United's directors acting in their capacity as directors of Belrose, were derelict in their duty to Belrose in giving such a drastic chattel mortgage and in not making provision in advance for the periodic payment which would fall due in a few days, the nonpayment of which was used by United as the excuse for the speedy foreclosure.

As an approximate statement, it can be considered from an examination of exhibit No. 3 that on December 15, 1943, Belrose had on hand (subject to an overdraft of $1,161.07) $1,157 cash plus petty cash, $300, a total of $1,457, also accounts receivable, $9,306.24, and $34,146.41 of other personal property without the item of $2,200 for good will. This situation does not suggest that it was fairly and honestly required and necessary that Belrose pledge all its assets, including cash and accounts receivable, to secure United for its $14,150 paid to Belrose to retire Belrose's debt to Producers, and no necessity is shown for making the chattel mortgage to cover a possible debt of $40,000, nor does Belrose's situation (prior to December 15, 1943) indicate an inability to meet the chattel mortgage payment, default in which payment gave rise to the foreclosure and consequent loss of all of the assets of Belrose. We consider that United inspired its directors, as directors also of Belrose, to be derelict in giving the chattel mortgage and United knowingly profited by such dereliction because United by forced sale of

the assets of Belrose acquired assets worth about $44,000 in foreclosure for $15,000. United claims to have advanced about $20,000 total to Belrose including Producers' account.

Defendants argue in their brief that the appraisal of the assets was "watered." This claim is refuted by exhibits Nos. 3 and 18. There is no testimony in the record that the assets were overvalued in exhibit No. 3, prepared by Wiseman, accountant (now plaintiff), dated December 15, 1943, nor the valuation in exhibit No. 18, dated November 30, 1943, compiled by witness accountant Shaer. Defendant Kayes testified, "Belrose Creamery Company could easily have paid everybody." The payments could not have been made if the appraisal was "watered." Kayes further testified, "They [United] never intended or said anything about paying these creditors."

In any event, after some adjustments in the above figures on account of reasonable allowances for items occurring in the carrying on of the business from December 15, 1943, until the sale, January 26, 1944, there can be no doubt that Belrose's assets were sold at the foreclosure sale for less than 50 per cent. of what the undisputed testimony shows was their true and actual value, with a net loss to Belrose very much greater than $23,000.

Plaintiff claims the taking and foreclosure of the chattel mortgage given United was a fraud on the rights of the creditors of Belrose, with which claim we are in accord. United has made itself liable for the loss to Belrose entailed upon Belrose by the seizure of the property of Belrose under the chattel mortgage and the foreclosure sale of the property resulting in the property being acquired by United.

Defendant Kayes testified that all of the assets of Belrose that United did obtain title to were obtained by the foreclosure sale.

Defendants' brief states that the "points" and trucks of Belrose's business were included in the chattel mortgage sale.

The chattel mortgage to United is void for fraud. The foreclosure sale was and is void and ineffectual to pass title to the assets undertaken to be sold at such sale. United and the 5 directors, Gurvitch, Gornbein, Sokonoff, Shwedel and Weiss, must account to plaintiff trustee for all assets (including "points") of Belrose received by United with interest at 5 per cent. per annum from December 16, 1943, to date of the decree on accounting hereafter to be had, for the items and at the value thereof as recited in exhibit No. 3 and at fair market value thereof as of December 16, 1943, for all assets of Belrose received by United and not listed on exhibit No. 3. United is to be first credited, however with $14,150 paid to Belrose for Producers' account. As to the loss, if any, of conducting the business of Belrose, from December 15, 1943, to the date of sale, United shall not be entitled to any credit therefor.

United's claim that Belrose was a going concern from December 16, 1943 to January 26, 1944, is found to be incorrect. We find that during that period United was in actual operation of the business formerly conducted by Belrose. United's act of taking the assets on December 16, 1943, would preclude defendants' claim that Belrose was from then on conducting its own business, and strongly indicative of the same conclusion is United's commingling the milk received from Producers for Belrose's business with milk received for United's other business.

Blifeld and Rosen on November 1, 1940, obtained from their own corporation, Belrose, a deed to the real estate in question, which deed was recorded January 17, 1941. Belrose gave a mortgage with warranty on the same real estate on February 1,

1943, the mortgage being executed on behalf of Belrose by Blifeld and Rosen as officers. This mortgage was to secure indebtedness of Belrose to Producers. The bill (filed May 29, 1945) alleges that the real estate in question at 7426 Fenkel avenue "was acquired with corporate funds of Belrose Creamery Company and that said corporation was (on December 16, 1943) the actual owner of said asset." Defendants Blifeld and Rosen were defaulted on December 14, 1946, and so must be treated as admitting this allegation. The testimony further indicated the correctness of such admission.

The sale by Blifeld and Rosen to United for $17,-500 on December 15, 1943, included the real estate and stock in Belrose. It can be inferred from all the testimony that the real estate was sold for the $17,-500 and the stock thrown into the bargain. Defendants Blifeld and Rosen are liable to plaintiff for $17,500 received on such transaction.

It is not shown that Producers was a party to the fraudulent transactions complained of.

The bill is dismissed as to defendants Producers and Kayes, and in that respect the decree appealed from is affirmed, but the decree is reversed as far as concerns the other defendants. The cause is remanded to the circuit court for Wayne county in chancery for an accounting on the part of all the remaining defendants to plaintiff trustee in bankruptcy in accordance with this opinion, and for such further proceedings as shall be found necessary. Creditors shall be entitled to notice of such accounting. Liability on the part of defendants shall be satisfied by payment of all the creditors of Belrose with interest from December 15, 1943, at 5 per cent. per annum, plus expenses of trustee in bankruptcy respecting enforcement of and obtaining payment of such creditors, the reasonableness of the expenses to be determined by the court on the ac-

counting. Costs to plaintiff against all defendants
except Michigan Milk Producers Association and
Kayes.

SHARPE, C. J., and BOYLES, NORTH, DETHMERS, and
CARR, JJ., concurred with REID, J.

BUTZEL, J. (*dissenting in part*). The trial judge
correctly dismissed plaintiff's bill of complaint as to
all of the defendants. I do not agree with Mr. Jus-
tice REID's opinion for reversal. Additional facts
disclosed by the record should be stated. I also
shall refer to the plaintiff Belrose Creamery Com-
pany as Belrose, defendants United Dairies, Inc.,
as United, and Michigan Milk Producer's Associa-
tion as Producers.

On December 15, 1943, Belrose was almost *in ex-
tremis*. It had rapidly lost ground. The manager
of Producers, a Michigan nonprofit association,
which supplied Belrose with milk, testified that on
or about February 1, 1943, Producers was unwilling
to extend credit to Belrose without security. Prior
to that date it had purchased milk on a cash basis.
It was operating on a hand-to-mouth basis. Its
money was tied up in equipment. Its ability to con-
tinue was not free from doubt. Producers did not
consider Belrose as financially sound when it de-
manded security before advancing credit. Pro-
ducers thereupon was given a real estate mortgage
from Belrose on the building occupied by Belrose
although the title stood in the name of Rosen and
Blifeld who were the owners of all of the capital
stock of Belrose. It further received a chattel mort-
gage on all of the personal property of Belrose. It
also received an assignment of the accounts receiv-
able. It also received an agreement from the owners
of the stock in Belrose in which they stated that they
owned certain trucks, routes, stops, points and good-

will of Belrose through individual purchases made by them, all of which they agreed to pledge to Producers to guarantee the payment of the account of Belrose to Producers and they further agreed not to dispose of such assets without notifying Producers. It was agreed that on the first day of each month Belrose would pay for the milk sold to it by Producers during the first 15 days of the preceding month, and on the 15th day of the month for the milk sold by Producers to Belrose during the last 15 days of the previous month. It was on the strength of these securities and guarantee that Producers continued to supply Belrose with milk on a credit basis. These credit periods are strictly in accordance with those set forth in Act No. 169, § 10a, Pub. Acts 1929, as added by Act No. 236, Pub. Acts 1935 * (Comp. Laws Supp. 1940, § 5316–1, Stat. Ann. § 12.611), which further provides for a revocation of the license of dealers who shall be in default in making payments to the supplier in accordance with such terms. Also, see *Johnson* v. *Commissioner of Agriculture,* 314 Mich. 548. Act No. 206, § 2, Pub. Acts 1935 † (Comp. Laws Supp. 1940, § 5394–22, Stat. Ann. § 12.802), provides for a preference over other creditors to Producers if a dealer is adjudicated bankrupt, gives a trust mortgage for the benefit of his creditor, et cetera.

United for a long time had negotiated for the acquisition of Belrose. It intended to operate its retail milk and ice cream business from or through Belrose. The record does not show that on December 15, 1943, or any time theretofore, United had negotiated for the outright purchase of the assets of Belrose. Its final agreement was to purchase all of the shares of the capital stock of Belrose and the land and buildings owned by Rosen and Blifeld.

---

* 2 Comp. Laws 1948, § 288.10a.—REPORTER.
† 4 Comp. Laws 1948, § 720.402.—REPORTER.

On November 30, 1943, the finances of Belrose, as indicated by its balance sheet of that date, were in a most precarious condition. Mr. Justice Reid points out the fact that the balance sheet still showed a capital of $7,910.18. However, it further showed that the original capital was $25,000 to which there had been added a surplus of $2,829.99 and donated capital of $7,518.73, all of which aggregated $35,-348.72; of this sum $27,438.54 had been wiped out. On November 30, 1943, there was included in this showing of capital $2,200 for "good-will" in a business that was being run at a loss at a time when dairies could sell all the milk they could obtain. The November 30, 1943, balance sheet may be summarized as follows: Current accounts payable were $13,955.18 due Producers, of which about $7,000 was payable on the following day under the terms of the credit agreement, and $13,966.96 due trade creditors, being a total of $27,922.14. There were also accrued liabilities, consisting of taxes, including $2,492.91 payroll withholding tax, drivers' bonds in amount of $1,101.43, payroll of $1,515.36, et cetera, aggregating $6,187.50. There were also long term liabilities totaling $10,435.62. The total liabilities amounted to $44,545.26. To meet these liabilities the assets consisted of $5,142.54 cash on hand, $264.34 due from officers, $110.73 from other sources, accounts receivable of $9,901.64 and loans of $135.77, or a total of $15,555.02 of current assets. The other assets consisted of an inventory of $9,-817.81, of which only $217.81 were products and $9,600 consisted of bottles, cases and cans. Fixed assets of $18,493.53 consisted of equipment carried at a depreciated value of about 50 per cent. of the original cost, and deferred assets, consisting of pre-paid caps, cartons, office supplies, insurance, et cetera, amounted to $6,388.98. After adding the "good-will" of $2,200, the amount of the total assets

was $52,455.34 as carried on the books. The liabilities exclusive of capital stock amounted to $44,545.-26, but it could not pay its debts for the amount of its current assets, including the inventory consisting principally of supplies and not milk was $25,-372.83 while it had current liabilities of $27,922.14, accrued liabilities of $6,187.50 and long term liabilities of $10,435.62. It had only $5,142.54 cash to meet an obligation of about $7,000 due to Producers in accordance with the contracts.

"Points," representing customers as reflected by milk sold on the routes is not mentioned in the balance sheet unless included under the term of goodwill. They would be valuable only if the business continued and milk was obtainable under Federal restrictions during the war. There was no indication that the supply would be shut off under the government regulations. The balance sheet of December 15, 1943, the date United purchased the stock of Belrose, showed a worse condition. The capital of the company had been reduced on the balance sheet to $7,287.36, thus showing a further loss of over $600 in 15 days. The cash on hand had been reduced to $1,457 against which there was a bank overdraft of $1,161.07. The amount due Producers was $14,-195.72 of which over $7,000 was to become due the following day under the credit agreement. We mention these figures to show that United was buying the capital stock of a business that was rapidly losing ground and that required further credit and the best of management for its rehabilitation. United loaned Belrose money to pay off the total amount due Producers and received as security a chattel mortgage. This was less than the security held by and released by Producers, when United advanced the money with which to pay off Producers.

In the agreements for the sale of the stock of Belrose and the building and land, title to which stood

in the name of the 2 stockholders, as stated in Mr.
Justice REID's opinion, United further agreed to in-
demnify these 2 stockholders of Belrose for any con-
tingent personal liability because of Belrose's previ-
ous failure to file its annual report. It also agreed
to repay the $1,100 received from drivers, referred
to as "drivers' bonds," and also some $1,500 still
due the government on account of payroll withhold-
ing taxes, but only on the condition that the 2 stock-
holders were held personally liable for such debts.
The sellers warranted that the total liabilities would
not exceed $42,000. Mr. Justice REID correctly
states that United did not expressly or impliedly
assume and agree to pay the debts of Belrose. As-
certaining the amount of Belrose's debts was a pru-
dent and not uncommon business precaution to pro-
tect the buyer, and had no other purpose or effect.
I cannot agree with the holding of Mr. Justice REID
that the giving of the chattel mortgage by Belrose
to United was fraudulent and that United must ac-
count to the creditors for the assets taken on the
foreclosure of said mortgage.

Mr. Justice REID points out that Belrose had al-
ways paid Producers and that it was not yet in de-
fault on December 15, 1943. There, however, was
over $7,000 due on December 16, 1943, and the state-
ment does not show there were funds on hand to
make this payment. It is true that there was no
showing that Producers had yet made any demands
as to this payment. It held security therefor which
it could have foreclosed. Also under the law, it
could have demanded the revocation of Belrose's
license. Even had it not done anything so drastic,
it is very doubtful whether it would have supplied
Belrose with any more milk. Producers already had
liens on all the assets of Belrose when United ad-
vanced enough to pay off Producers and secure a
release of all the security held by it. It used its

own credit to obtain the milk thereafter delivered to Belrose. This was done by United buying the milk for Belrose directly from Producers and charging Belrose with the amounts due for milk thus purchased. The chattel mortgage given by Belrose to United covered not only the amount advanced to pay off Producers but also further sums, but in all not over $40,000 that would become due from Belrose to United.

The record shows that United did not seize the assets of Belrose on December 16, 1943, as claimed by the plaintiff. It is true that as the sole stockholder it had control of Belrose. It elected its own board of directors as the directors of Belrose. This it had a legal right to do although it placed a higher duty of fair dealing on such directors in transactions between Belrose and United. It does not appear that such duty was breached in the giving of this chattel mortgage. The terms were strict, but they required only a payment of $400 weekly on the debt of $14,195 previously owed to Producers. It also required the payment on Monday of each week for the milk delivered to Belrose during the previous week. These were far more liberal terms than the payment of the $7,000 due Producers every 15 days under the Belrose's previous agreement. The unsecured creditors' position certainly would not have been improved if United had merely taken an assignment of the security held by Producers.

It was claimed by United that it intended to operate Belrose separately from United, and there was no showing that this intention would not have been carried out. The fact that it intended to use Belrose for the retail milk and ice cream business in no way made the sale fraudulent. Shwedel, whose testimony is referred to in the foregoing opinion, testified that United wanted to get the entire Belrose business through the acquisition of its capital

stock. However, it is not shown that anything illegal was done. United had a right to operate Belrose as a subsidiary.

It was not shown that the chattel mortgage was given to cut off the unsecured creditors by foreclosure proceedings. It is true that this was done a short time after the giving of the mortgage. The record, however, shows that attorneys for unsecured creditors holding about $4,500 in unsecured claims, as well as 4 or 5 other creditors demanded payment almost immediately after December 16, 1943, and they threatened to bring suit and obtain judgments unless their accounts were paid. Belrose was in no better position to pay unsecured creditors than it had been in prior to this date. The total unsecured claims were $24,770.68. At the end of the first week, when the first payment became due under the mortgage, and the creditors had threatened suit, United began foreclosure proceedings in accordance with the terms of the mortgage. Belrose also filed a bill for dissolution. It alleged its inability to continue as a paying business. United continued to operate Belrose as a going concern until the foreclosure sale. After some delay, the sale was held by an auctioneer who acted in that capacity in the Federal courts. The record shows the sale was well attended and that it was announced at the sale that United would give the purchaser a favorable lease of the building. However, one of the attorneys for the creditors, who also appeared as co-counsel at the hearing of the case in the trial court, announced, at the sale, that anyone who purchased at the sale would buy a lawsuit. Obviously this froze the bidding and United obtained the assets on a bid of $15,000. The receiver appointed in the dissolution proceedings in the State courts is the trustee in bankruptcy appointed in the Federal courts and as such trustee brought the instant suit. No fraudulent intent or action on

the part of United has been shown.   Upon the demands of the creditors it became clear that Belrose could not be continued without an additional advance by United.   It was not shown that United used the failure of Belrose to pay the first instalment as a pretext to seize the assets.   There was nothing fraudulent or illegal in United asserting its legal rights.   Its directors also still owed duties to the stockholders of United.

The claim was made in the bill of complaint that the giving of the chattel mortgage by Belrose to United was an illegal preference under the Federal bankruptcy act.   This charge was not proven as it was shown that the chattel mortgage was given for a present passing consideration.   Appellant in its statement of questions involved obviously has abandoned this claim, so we do not need to discuss it.   Other claims of appellant have been considered but do not merit discussion.

In the last analysis we are relegated to rules of law.   It is no vice or illegality for one corporation to invest in another or own the capital stock of a subsidiary and to thereby control its operations.   It is incumbent upon the parent corporation to deal fairly and honestly with its subsidiary.   See *Gledhill* v. *Fisher & Co.*, 272 Mich. 353 (102 A. L. R. 1042); *Finley* v. *Union Joint Stock Land Bank of Detroit*, 281 Mich. 214; *John A. Parks Co.* v. *General Discount Corporation*, 294 Mich. 316.   While the facts of the case are rather complicated and possibly create a cloudy atmosphere at first appearance, a careful examination of the entire transaction as disclosed by the record shows that United acted strictly within its rights; it did not act fraudulently and did not even inferentially become responsible for the unsecured debts of Belrose.   I believe the law and its proper application is set

forth in *Chase* v. *Michigan Telephone Co.*, 121 Mich. 631. We quote from the syllabus as follows:

"Evidence that the property and franchises of a telephone company were purchased by another company, which was the owner of nearly all of the seller's capital stock, and that after the sale the business was conducted in the same manner as before, without a change of employees, does not show that the new company was a consolidated company, liable for the payment of the obligations of the old."

We further quote from the opinion as follows:

"The law is well settled in regard to liability of the consolidated or purchasing corporation for the debts and liabilities of the consolidating or selling corporation. Such obligations are assumed (1) when two or more corporations consolidate and form a new corporation, making no provision for the payment of the obligations of the old; (2) when by agreement, express or implied, a purchasing corporation promises to pay the debts of the selling corporation; (3) when the new corporation is a mere continuance of the old; (4) when the sale is fraudulent, and the property of the old corporation, liable for its debts, can be followed into the hands of the purchaser. *Austin* v. *Tecumseh National Bank*, 49 Neb. 412 (68 N. W. 628, 35 L. R. A. 444, 59 Am. St. Rep. 543). Plaintiff produced no evidence tending to bring the defendant within any of these cases."

The decree of the trial court dismissing the bill is affirmed, with costs to defendants.

BUSHNELL, J., concurred with BUTZEL, J.