## MASTERSON et al. v. PERGAMENT et al.

No. 11410.

United States Court of Appeals
Sixth Circuit.

March 23, 1953.

See also, D.C., 93 F.Supp. 9.

Robert S. Marx, Cincinnati, Ohio, Lemuel B. Schofield, Philadelphia, Pa., Clair John Killoran, Wilmington, Del., and Lewis M. Dabney, Jr., New York City, G. Fred Di Bona, Marvin Comisky, Philadelphia, Pa., and Murray C. Bernays, New York City, Ernest P. LaJoie, Detroit, Mich., Samuel Marion, New York City, and David V. Martin, Detroit, Mich., on brief, for objecting stockholders and appellants.

Theodore E. Rein, Chicago, Ill., Rockwell T. Gust and George E. Brand, Detroit, Mich., Gordon Johnson, San Francisco, Cal., for appellees.

Samuel L. Chess, New York City, Perlman, Goodman, Hecht & Chesler, Chicago, Ill., Fischer & Fischer, Detroit, Mich., Theodore E. Rein, Chicago, Ill., Samuel L. Chess, New York City, and Bernard T. Hecht, Chicago, Ill., of counsel, for Jerome R. Pergament and George J. London, plaintiffs and appellees.

Butzel, Eaman, Long, Gust & Kennedy, Rockwell T. Gust, A. Hilliard Williams and Philip T. Van Zile, II, Detroit, Mich., for Jos. W. Frazer, H. J. Kaiser, E. F. Kaiser, G. G. Sherwood, E. E. Trefethen, Jr., Clay P. Bedford, W. A. MacDonald, Hickman Price, Jr.

Willkie, Owen, Farr, Gallagher & Walton, Mark F. Hughes and Walston S. Brown, New York City, for Kaiser-Frazer Corp.

George E. Brand and George E. Brand, Jr., Detroit, Mich., Gordon Johnson and Robert G. Sproul, Jr., San Francisco, Cal., for Kaiser Aluminum & Chemical Corp. (formerly The Permanente Metals Corp.).

Norman Annenberg, New York City, for Abram J. Berkwitz, Abraham Fistel, Claude S. McTeague, Richard H. Locke, Bernard D. Brodie, stockholders of Kaiser-Frazer Corp.

Before SIMONS, ALLEN and MILLER, Circuit Judges.

ALLEN, Circuit Judge (dissenting).

This is an appeal from an order of the District Court approving a compromise entered in a derivative suit between Pergament and London, appellees and stockholders of Kaiser-Frazer Corporation (hereinafter called Kaiser-Frazer) and appellees Joseph W. Frazer, Henry J. Kaiser and other directors of Kaiser-Frazer Corporation. Graham-Paige Motors Corporation, Otis & Company, Cyrus Eaton, The Permanente Metals Corporation, Permanente Products Company, United States of America, Reconstruction Finance Corporation and Kaiser-Frazer Corporation were joined as defendants. The United States and the Reconstruction Finance Corporation were dismissed as party defendants and no error is assigned to this action.

The compromise covers a series of stockholders' suits filed primarily against the directors of Kaiser-Frazer, a corporation formed in 1945 by Henry J. Kaiser and the Kaiser interests for the purpose of manufacturing automobiles. The various stockholders' suits in general assert breach of trust on the part of the directors, and fraud and illegal preferences to various corporations dominated by the Kaiser interests, and joined as defendants. The compromise was executed October 25, 1949, submitted to the District Court of the Eastern District of Michigan, and approved under Rule 23(c), Federal Rules of Civil Procedure, 28 U.S.C.A. The judgment dismissed the action of Pergament and London which as finally amended included the claims of all other stockholders' derivative suits theretofore started against the same defendants. The suit for damages of Kaiser-Frazer Corporation against Otis & Company filed in New York, while growing out

of one phase of the transactions involved, was not affected by the judgment.

The first stockholders' action was instituted by James F. Masterson February 9, 1948, in the state court of Wayne County, Michigan. A similar suit was filed by Michael Stella May 10, 1948, in the United States District Court for the Southern District of New York. The instant case was filed by Jerome B. Pergament and George J. London in the District Court of the Eastern District of Michigan May 14, 1948. June 30, 1948, Eva Lefker instituted an action in the United States District Court of Delaware and a similar suit was started by Otis & Company in the Chancery Court in Delaware July 2, 1948. In all of these suits service was obtained a considerable time before the settlement was executed.

July 9, 1948, the plaintiffs Fleming and Piantineda filed in the state court of California a derivative suit attacking the lease of the Long Beach property.

The following were the most important claims: (1) The Graham-Paige transaction in December 1946, as to which appellants claim that a loss of several million dollars was incurred by Kaiser-Frazer under a contract by which it acquired all of the automotive assets of Graham-Paige, a corporation in which Joseph W. Frazer, president of Kaiser-Frazer and one of its directors, was heavily interested; (2) the Fleetwings transaction in 1946 and 1947, between Kaiser Fleetwings, Inc., a Kaiser-owned corporation, and Kaiser-Frazer. It is claimed among other things that the prices paid Fleetwings by Kaiser-Frazer for automobile doors and deck lids were excessive and exorbitant. (3) The Permanente Metals transaction, which arises out of the transfer in 1946 by Kaiser-Frazer to the Permanente Metals Corporation, approximately 65% of the stock of which was at the time owned by the Kaiser interests, of a letter of intent issued by the United States Government and accepted by Kaiser-Frazer. The letter offered a lease to Kaiser-Frazer on favorable terms with option to purchase an aluminum rolling plant at Trentwood, Washington, for which the Government had paid approximately $47,630,000. While the lease of other Government aluminum plants was involved, it is particularly contended that the contract for the lease of the Trentwood plant was transferred to Permanente without adequate consideration. (4) The manipulation and stabilization transaction arising out of claimed violations in 1948 by Kaiser-Frazer of § 9(a) (2) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78i (a) (2). Kaiser-Frazer had agreed with three underwriters to offer an issue of 1,500,000 shares of stock for sale to the public at the close of the market on February 3, 1948. It was arranged that Kaiser-Frazer should stabilize the stock by purchase until the close of the New York Curb, and it was estimated that Kaiser-Frazer, in order to stabilize, should purchase not more than 25,000 shares. These arrangements miscarried, and as a result Kaiser-Frazer purchased 186,200 shares of its own stock at a price of $13.50 per share. Later Otis & Company and the First California Company, two of the underwriters, notified the corporation that they would not handle the stock and so the stock sale was completely abortive. Out of this transaction hostility and litigation arose between Kaiser-Frazer and Otis & Company. A suit filed by Kaiser-Frazer in New York for damages for breach of contract by Otis & Company due to its failure to accept and pay for the stock which it had contracted to underwrite was successful in the United States District Court. But the Court of Appeals for the Second Circuit reversed the judgment below and directed entry of judgment for defendants upon the ground that Kaiser-Frazer in this transaction misrepresented certain items of profit in the prospectus and registration statement and that Otis & Company was thus released from liability. Kaiser-Frazer Corp. v. Otis & Co., 2 Cir., 195 F.2d 838. Certiorari denied, 344 U.S. 856, 73 S.Ct. 89.

The Court of Appeals for the Second Circuit declared in that case, 195 F.2d at pages 843, 844: "Kaiser-Frazer stated its earnings in such a way as to represent that it had made a profit of about $4,000,000 in December 1947. This representation was $3,100,000 short of the truth. * * * Any sale to the public by means of the pros-

pectus involved here would have been a violation of the Securities Act of 1933, 15 U.S.C.A. § 77l(2)."

Other actions pleaded involved business deals with Kaiser Steel and Kaiser Engineers, corporations owned and dominated by the Kaiser interests, the manufacture by Kaiser-Frazer of 30,000 rototillers for Graham-Paige, and the granting of the New York Kaiser-Frazer distributorship to the Muntz Car Company. These actions asserted that favoritism was shown and excessive fees and profits paid by Kaiser-Frazer to the companies named. Interlocking directorates existed between the various Kaiser companies, and it is alleged that Kaiser-Frazer, in which the Kaiser interests owned a smaller proportion of the stock than in the other companies, was milked for their profit.

Gross negligence is charged in the lease of the Long Beach, California, property.

If the directors of the corporation acted fraudulently or unfairly in arriving at the settlement, it should be set aside. Feldman v. Pennroad Corp., 3 Cir., 155 F.2d 773. The District Court correctly held that in the proceedings under Rule 23(c) it is the duty of the court to see that the compromise is fair and reasonable and that no collusion or fraud has been practiced in the consummation of the settlement agreement. Winkelman v. General Motors Corp., D.C., 48 F.Supp. 490, 493. The directors and dominant and controlling stockholders are fiduciaries. Their powers are powers in trust. Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281; Epstein v. United States, 6 Cir., 174 F.2d 754, 764; Mayflower Hotel Stockholders Protective Committee v. Mayflower Hotel Corp., 84 U.S.App.D.C. 275, 173 F.2d 416, 418; Young Spring & Wire Corp. v. Falls, 307 Mich. 69, 101, 11 N.W.2d 329.

Under Michigan law the burden was on the interlocking directors to prove that they acted fairly in the interests of the corporation. Wiseman v. United Dairies, Inc., 324 Mich. 473, 37 N.W.2d 174; Mich. Stat.Ann. 21.13(5). Comp.Laws 1948, § 450.13, subd. 5. This is also the federal rule. Epstein v. United States, supra; Wentz v. Scott, 6 Cir., 10 F.2d 426, 428.

As stated by Judge Knappen, in such cases co-directors and managers occupy a fiduciary relation toward both corporations. Contracts between them will be carefully scrutinized. Where there is an apparent unfairness in the contract or personal advantage to one party to the detriment of the other, the burden rests upon the one obtaining such apparent unfair advantage to show his good faith and the propriety of his act.

Most of the cases here pleaded involved common directors. The District Court held that in all probability there would be no recovery by the stockholder plaintiffs in "(a) the Trentwood; (b) Manipulation-Stabilization; (c) Kaiser Steel; (d) Kaiser Engineers; and (e) Long Beach-Rototiller." The court held that there might be a recovery on the stock valuation involved in the transfer of automotive assets by Graham-Paige to Kaiser-Frazer; on the Muntz Car Company deal, and also from Fleetwings on the contract to manufacture doors for Kaiser-Frazer. In view of the burden of proof resting on directors and officers acting in dual capacities it is conceivable that the recovery might be greater in amount and that it might cover items other than those indicated in the opinion and findings of the District Court.

None of the various stockholders' suits at the outset involved all the nine causes of action. The Masterson suit, as amended in May, 1948, pleaded all except Permanente. The Stella suit set up illegal manipulation of the price of Kaiser-Frazer stock. The Pergament and London suit originally pleaded only illegal stock manipulation and the purchase of the automotive assets of Graham-Paige. It was amended September 13, 1948, to include the Permanente transaction. The Lefker suit was the first to attack the transfer of the United States letter of intent from Kaiser-Frazer to Permanente, for the Trentwood Aluminum Rolling Mill, and pleaded this cause only. Otis & Company pleaded only the Permanente transaction.

Early in 1949, then, stockholders' derivative suits were pending against the directors of Kaiser-Frazer in three state courts and in three federal courts. The states in-

cluded Michigan, California, New York, and Delaware.

In April, 1949, Kaiser-Frazer was in default upon bank loans of $16,000,000 guaranteed by the Kaiser interests, and faced the threat of liquidation. It secured an offer from the RFC in October, 1949, for a loan of $44,400,000. The granting of this loan was conditioned, among other things, upon the making of a guaranty of $15,000,000 of the loan by Kaiser and his associates and a pledge of $10,000,000 of collateral. Henry J. Kaiser stated that he or his companies would not guarantee the loans unless the stockholders' suits were settled; but, as a matter of fact, on November 9, 1949, the day the order to show cause why the compromise should not be approved was filed, the loans were guaranteed by Kaiser and his associates in a contract which made no mention of the stockholders' suits.

About September 21, 1949, Mark F. Hughes, an attorney connected with the firm which was counsel for Kaiser-Frazer in these proceedings as well as for Frazer and the Kaisers individually, stated to Samuel L. Chess, attorney for Pergament and London, that there was a possibility of an offer of settlement. After asking for and receiving assurance that Chess had nothing whatever to do with Otis & Company, Hughes said that he might soon have a proposal. Hughes required, and Chess agreed, that Chess would disclose to no one, not even to his own partners or associates, that there was a possibility or any talk of settlement. Chess associated an attorney, Israel B. Perlman, with him, who said that he "couldn't evaluate or appraise the various causes of action," but agreed to help Chess in negotiation. Hughes dissuaded Chess from taking depositions, saying that he would give Chess any information that he would like to have. Later Hughes and his partner, Walston S. Brown, met with Chess. Brown explained some of the facts of the Graham-Paige transaction to Chess, and they also discussed the Fleetwings controversy and the matter of the lease of the Long Beach plant. Brown, in addition to being a member of the firm representing Kaiser-Frazer and being himself a defendant director of Kaiser-Frazer, was also attorney for Henry J. Kaiser, Edgar Kaiser, and Joseph Frazer. At the proceedings in the District Court he testified that in these negotiations with Chess and Perlman his effort was to get the easiest possible terms of settlement for the individual defendants and Graham-Paige, and that he therefore avoided making disclosures or stating facts or furnishing information that would support a recovery for Kaiser-Frazer in these suits. This striking admission was made although Brown's firm was paid by Kaiser-Frazer for these negotiations.

Settlement of the Pergament and London suit was finally proposed. The consideration offered was (1) the guaranty by the Kaiser interests of the RFC loan; (2) the purchase by Kaiser Fleetwings (Kaiser Metal Products, Inc.) at their depreciated book value of certain presses which belonged to Kaiser-Frazer and were in the Fleetwings plant; and (3) $50,000. Chess and Perlman were pleased with the offer. They thought that if they got only the guaranty of the RFC loan it would be a "wonderful settlement." They decided to ask for $500,000, but agreed if need be they would accept the offer as given, rather than jeopardize the compromise. On October 25, 1949, the settlement was executed as proposed, except that it substituted the $500,000 demanded by Chess and Perlman for the $50,000 offered. Three days previous, October 22, 1949, Chess, securing from Hughes the necessary data, filed an amended petition which included the various other causes of action pending in other jurisdictions. The settlement contract contained broad general releases in favor of all the defendants including Graham-Paige, Frazer and Fleetwings, which contributed nothing. The directors of Kaiser-Frazer, all of whom were originally joined as individual defendants, approved the compromise. The proceedings were then brought before the District Court for hearing pursuant to notice under Rule 23(c), Federal Rules of Civil Procedure. So far as this record shows, no discussion was held in the negotiations as to the value of the added

causes of action and the figure of settlement remained the same as that negotiated for the causes of action originally pleaded.

Appellants attack the settlement upon the ground that it was secured by concealment and fraud and that the consideration was inadequate. The District Court held an extended hearing and found that in none of the transactions had there been fraud, collusion, or attempt on the part of the Kaiser interests to benefit at the expense of Kaiser-Frazer. The court concluded that guaranty of the RFC loan in itself justified the compromise, that the settlement was for the best interests of all the stockholders and dismissed the action. It considered that concealment of the negotiations was justified by the hostility of Otis & Company and other stockholder plaintiffs and that, in view of the extended hearing, concealment of information during the negotiations was immaterial.

Findings of the District Court when based on oral testimony are generally conclusive in the absence of manifest error. But definite limitations to this rule have long existed. If the findings are based entirely on documentary evidence the reviewing court may make its own findings. If the trial court's finding based on oral testimony is contradicted by the undisputed facts, it is not controlling. As stated in United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746, the findings of the trial court, when dependent upon oral testimony, have great weight but are never conclusive. If the findings leave the reviewing court with the "definite and firm conviction that a mistake has been committed," they are clearly erroneous. United States v. United States Gypsum Co., supra, 333 U.S. 364, 395, 68 S. Ct. 525. Orvis v. Higgins, 2 Cir., 180 F.2d 537.

In the writer's opinion the controlling findings here are clearly erroneous. The proposed settlement involved in emphatic form a compromise of actions against directors and officers serving in dual capacities in far-flung companies dominated by one man, his family, and close associates.[1] As pointed out in Upson v. Otis, 2 Cir., 155 F.2d 606, if the suits were to go to trial, the fiduciaries would usually bear a heavy burden of proof as to all crucial issues.

The District Court considered that arms-length negotiations are not required for a valid compromise. We think under the instant record this was error of law. This was not the usual compromise of a claim

[1]. As stated in the Kaiser-Frazer Corporation Proxy Statement May 18, 1948, which is typical: Henry J. Kaiser Company, The Kaiser Company, Kaiser Engineers, Inc. and The Permanente Metals Corporation, owned 214,000, 77,500, 77,500 and 100,000 shares, respectively. Henry J. Kaiser Company owns 40% of the outstanding capital stock of Kaiser Engineers, Inc. Henry J. Kaiser owns 50% of the outstanding capital stock, carrying 66⅔% of the voting rights, of Henry J. Kaiser Company and 6% of the outstanding capital stock of The Kaiser Company. He is an officer and a director of each of these two companies and of The Permanente Metals Corporation and a director of Kaiser Engineers, Inc. An aggregate of approximately 65% of the outstanding capital stock of The Permanente Metals Corporation is owned by Henry J. Kaiser Company, The Kaiser Company, and Kaiser Engineers, Inc. Edgar F. Kaiser owns 25% of the outstanding capital stock of Henry J. Kaiser Company and 20% of the outstanding capital stock of The Kaiser Company.

He is an officer of Henry J. Kaiser Company and of Kaiser Engineers, Inc. and an officer and director of the The Kaiser Company. E. E. Trefethen, Jr., G. G. Sherwood and Clay P. Bedford are directors and/or officers of Kaiser Engineers, Inc., and each owns 5% of the outstanding capital stock thereof. E. E. Trefethen, Jr., G. G. Sherwood and Clay P. Bedford are directors and/or officers of The Kaiser Company, and each owns 8⅓% of the outstanding capital stock thereof. E. E. Trefethen, Jr. and G. G. Sherwood are directors and officers of The Permanente Metals Corporation. G. G. Sherwood is Trustee of a trust which holds 25% of the outstanding stock of Henry J. Kaiser Company and 20% of the outstanding capital stock of The Kaiser Company.

While there was not an identity of directors between Graham-Paige and Kaiser-Frazer, there was a substantial identity of important officers. Joseph Frazer was president both of Graham-Paige and Kaiser-Frazer and five other defendants held office in both corporations.

belonging only to the negotiating party. Pergament and London were trustees for the other stockholders. Young v. Higbee Company, 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890. The individual appellees were directors and hence fiduciaries. Pepper v. Litton, supra. They were acting in dual capacities. A compromise with and on behalf of fiduciaries and agreed to by stockholders who represent all other stockholders must be closely scrutinized in order to determine whether fiduciary duties have been violated. A release obtained by a fiduciary through concealment or misrepresentation is of no effect. Maas v. Lonstorf, 6 Cir., 194 F. 577, 587–588; Irving Trust Company v. Deutsch, 2 Cir., 73 F.2d 121, 126.

The issue of concealment is material. Certain facts were, as Hughes admitted, suppressed during the period of negotiation. Thus it does not appear that Chess and Perlman were informed by Hughes or Brown of the details of the claim for over a million dollars held meritorious by the District Court for excessive prices paid to Fleetwings for doors. Perlman was not informed of the prior negotiations with reference to the purchase of the presses by Fleetwings. He learned of them for the first time in court. The issue of concealment is also material because the attorneys for Pergament and London were forced to conceal from all other attorneys and from their own associates the fact that there was any possibility of settlement. The District Court held that the compromise was arrived at through bargaining in good faith, in spite of the exclusion of the parties in five other pending cases. The court held that a legitimate reason for exclusion of the other parties was that Otis & Company was hostile and that the Masterson case was filed by a stockholder who had formerly been an attorney for Otis & Company.

This was error of law. It is not the law that attorneys representing stockholders in derivative suits, or their parties, may be excluded from the litigation because of their hostility toward the group which is being sued. Hostility is usually present in stockholders' suits. The motive of the stockholder in filing a derivative action is immaterial. Young v. Higbee Company, supra, 324 U.S. 214, 65 S.Ct. 600. There the Supreme Court declared that the rights of stockholders were not to be ignored "because of some motive attributable to Young." See also Johnson v. King-Richardson Company, 1 Cir., 36 F.2d 675, 67 A.L.R. 1465. The exclusion of parties who had already pleaded the same and other causes of action and secured valid service is particularly inexcusable because of the deliberate and successful attempt to cut off their causes of action by amendment so timed that the settlement would be executed, even though not approved by the court, before other plaintiffs could effectively protest.

The proceedings for settlement were not only instituted but admittedly directed by the attorneys for the appellees. Depositions were discouraged. Chess and Perlman were briefed by Brown and Hughes whose firm was paid by Kaiser-Frazer but admittedly acted adversely to it. In the negotiations Perlman, who had charge of the bargaining, refused to discuss the merits of the causes of action pleaded in the Pergament amended complaint. He frankly said he could not evaluate them. Brown said that he had no knowledge of his own about the Permanente transaction. Perlman's office associates were acquainted with the claims but Perlman was forbidden to discuss them. The only question debated in the conferences was the amount of cash settlement.

As trustees for other stockholders, Chess and Perlman were required to evaluate the causes of action, to press them sincerely for the benefit of the corporation, and not to eliminate claims without receiving adequate consideration.

But evaluation was completely wanting both with reference to the causes of action upon which the negotiation was based and those added by amendment. For instance, the Fleetwings controversy added by amendment constituted a good case on behalf of Kaiser-Frazer, but Chess and Perlman did not urge this.

Pergament and London were under a duty fairly to represent the common rights of

other stockholders. Young v. Higbee Company, supra, 324 U.S. 212, 65 S.Ct. 594. They did not, under the undisputed facts, represent them at all as to Fleetwings or the Muntz Car Company case. Up to a few days before the actual settlement, the Fleetwings transactions were considered of no importance by Chess. They were not included in the amended petition of September 13, 1948, upon which the negotiations were founded and the amount of the settlement was in no way increased when they were included in the final amendment. The Muntz Car Company transaction, evidence as to which has been deleted from the record, was found by the court to have probable merit in the amount of $85,000, and was also completely ignored. These meritorious causes of action, under the admitted evidence, have no weight in the result achieved for Kaiser-Frazer.

The releases included in the proposed settlement emphasize the lack of effective representation by Chess and Perlman. The general releases covered three non-contributing defendants, Graham-Paige, Fleetwings, and Joseph Frazer. These were the defendants primarily liable if the District Court's conclusion that the Fleetwings door transaction, the Graham-Paige receipt of undervalued stock from Kaiser-Frazer, and the Muntz Car Company distributorship matter presented cases of merit. The order of the District Court limited the general release provisions of the settlement in certain ways but left them in force as to these causes of action. These releases were of course desirable for the appellees but hardly beneficial to Kaiser-Frazer and other stockholders. Brown, a chief negotiator for the settlement on behalf of the appellees, director and secretary of Kaiser-Frazer, and admittedly acting in dual capacities, was released on motion of the plaintiffs prior to the hearing.

It is conceded that the settlement agreement was planned and negotiated by the attorneys for the appellees Henry J. Kaiser, Joseph Frazer, and individual directors who, while nominally representing Kaiser-Frazer, admitted that they were acting adversely to its interests. These attorneys picked the suit that they would settle, with its friendly lawyers, and by amendment inserted in the suit causes already pending in three federal courts in other states and in three state courts. The adversary relationship essential to protection for Kaiser-Frazer was thus seriously impaired if not destroyed. Cf. In re Insull Utility Investments, D.C., 6 F.Supp. 653, affirmed 7 Cir., 74 F.2d 510.

Such a settlement subverts the purpose of § 23(a) that the persons, members of a class, who may sue and be sued on behalf of all must "fairly insure the adequate representation of all." Weeks v. Bareco Oil Company, 7 Cir., 125 F.2d 84, 91. Judge Evans there pointed out, 125 F.2d at page 93 that some individual plaintiffs might wish to sue in a jurisdiction of their own selection. The stockholders here who had filed suits in so many different jurisdictions lost this opportunity through the final amendment without notice to them of the Pergament petition.

The dissent of stockholders from the action of one assuming to represent the class makes adequate representation impossible. McQuillen v. National Cash Register Company, D.C., 22 F.Supp. 867, 873. In this case there was no showing that all the stockholders desired the relief sought in the suit. The practical result here would seem to be that stockholders can compel others without notice to be bound by a compromise which they oppose. Lefker, Masterson, and Otis & Company could not dissent because they knew nothing of the projected settlement prior to its execution. As declared by the Court of Appeals of the District of Columbia in Knowles v. War Damage Corporation, 38 U.S.App.D.C. 388, 171 F.2d 15, 18, certiorari denied 336 U.S. 914, 69 S.Ct. 604, 93 L.Ed. 1077: "Factors bearing upon adequacy of representation are various and are not specifically enumerated in the law: It is pertinent to consider whether other members of the class have notice, express or constructive, of the pendency of the action and of its representative character; whether such members desire, or acquiesce in, such representation; whether the number of parties is sufficient as compared to the numerical size of the class." As to numerical representation here, the

District Court rightly held under the Federal rule and also under Michigan law that Pergament was not competent to sue on the Permanente cause of action because he acquired his stock after the transactions complained of. This leaves Dr. London, owner of 8 shares, as claimed representative of over 30,000 Kaiser-Frazer stockholders in the all-important Permanente controversy.

But the question of notice and acquiescence in representation by Pergament and London is even more important. While the members of the class had constructive notice of the pendency of the amended complaint of September 13, 1948, they had no effective notice of the amendment of October 22, 1949, which appropriated all other causes of action. Three days intervened between this final amendment and the execution of the compromise. Appellees' witnesses frankly state that the compromise negotiations were carefully concealed because the appellees knew that other parties in similar suits would "make as much trouble for us as they possibly could." The inescapable inference is that appellees knew that their representation would not secure assent. Notice was given to all parties before hearing in the District Court upon the compromise but notice was carefully withheld from parties other than the negotiators until the compromise agreement was executed.

If manipulations such as these are upheld in the courts, the stockholders' derivative suit, which was developed to protect the corporation and its stockholders from breach of trust or fraud on the part of the directors, will cease to be a protective shield. The deliberate concealment and exclusion of other parties and appropriation of their causes of action run counter to the purpose of Rule 23(a) and constitute a constructive fraud upon the stockholders of Kaiser-Frazer.

Appellees urge that the fact that the District Court held extended hearings and decided that the settlement benefited the corporation wipes out all preliminary considerations. As the writer views this record the compromise sent the case to the District Court with the objecting stockholders carrying an unfair burden. In all but two of the causes of action pleaded, the stock manipulation and Long Beach, if they had come to trial, the burden of proof would have been on the directors. Upson v. Otis, supra. This also is the law of Michigan. Wiseman v. Musgrave, 309 Mich. 523, 16 N.W.2d 60. Here the burden was in effect placed on the stockholders. Causes of action which had been completely ignored in the settlement were lumped together, presented to the District Court as a *fait accompli* and were considered on a tangent, not squarely as they would be in a trial where the issue is not the probability of recovery but the actual law affecting liability and the actual facts which establish whether liability exists.

I think the settlement should be set aside because of unfairness in the negotiations. Also I think that the consideration is inadequate.

What Kaiser-Frazer received in settlement was $500,000 from Permanente, around $880,000 from Fleetwings for presses which belonged to Kaiser-Frazer, and the guarantee of the RFC loan. Lloyds of London stated that it would cost $3,750,000 to have such a guaranty supplied. This is not disputed. For the purposes of this discussion I assume that payment for the presses was a valid consideration and proceed to discuss the question of consideration on the basis that Kaiser-Frazer received the equivalent of $5,130,000 in the settlement.

With the exception of the Muntz Car Company matter, the automobile door item in Fleetwings, and the undervalued stock in Graham-Paige, the District Court found no merit in any of the nine causes of action stated. He disallowed the claim for $2,714,000 paid for "intangibles" in Graham-Paige and the deck lid item in Fleetwings as well as the entire cause of action for Permanente.

I shall discuss these three transactions only, without prejudice to other causes of action stated. They affect the vital issue of adequate consideration, and as to them the District Court's conclusions are based upon clearly reviewable findings. Appraisal of the merits of litigation requires legal judgment and involves mixed questions of

law and fact. As to Fleetwings, Graham-Paige, and Permanente, the evidence here relied on is either undisputed or consists of documentary as well as oral testimony. Moreover, the documentary evidence on controlling issues contradicts the oral statements. The doctrine announced in Orvis v. Higgins, supra, 180 F.2d 539, therefore applies: "Where the evidence is partly oral and the balance is written or deals with undisputed facts, then we may ignore the trial judge's finding and substitute our own," and we may follow the same course "if the written evidence or some undisputed fact renders the credibility of the oral testimony extremely doubtful". Arnolt Corporation v. Stansen Corporation, 7 Cir., 189 F.2d 5, 10; Dollar v. Land, 87 U.S.App. D.C. 214, 184 F.2d 245, 249.

### Fleetwings

Kaiser Cargo, later Kaiser Fleetwings, Inc., now Kaiser Metal Products, Inc., was established by the Kaiser interests which have always owned, dominated, and controlled it. Henry J. Kaiser, his family, and associates owned most of the stock, and the boards of Kaiser-Frazer and Fleetwings were largely interlocking. Kaizer-Frazer supplied Fleetwings with machinery costing $800,000 which Kaiser-Frazer installed. After the Masterson suit was filed, $600,000 was paid by Fleetwings as the cost of installation. Presses to the value of $950,754 were supplied by Kaiser-Frazer to which it retained title. Kaiser-Frazer then contracted with Fleetwings to deliver deck lids and doors under contracts which provided that Kaiser-Frazer should pay cost plus 10%. The District Court called these contracts "quite a liberal arrangement." Admittedly the result was that the Kaiser interests were guaranteed a 10% profit on these articles. Against the background of interlocking managements and their interplay the items of the doors and deck lids are significant. An overcharge of $228,000 is claimed for the deck lids and an item of around $1,400,-000 for the doors.

The District Court held it possible that the door part of the Fleetwings contract might be construed as detrimental to the interests of Kaiser-Frazer. It thus held that the most important of the contracts between Fleetwings and Kaiser-Frazer was probably tainted with self-dealing and that the claim with reference to the doors was meritorious.

This claim grew out of the fact that up to December, 1947, car doors had been manufactured for Kaiser-Frazer by The Hayes Manufacturing Company, a concern long established in this business. During the period in question it turned out 1,400,000 rear and front doors for Kaiser-Frazer. December 5, 1947, Kaiser-Frazer entered into a contract with The Edward G. Budd Company for the manufacture of front doors at a price of $12.00 per door. On December 4, at the request of Kaiser-Frazer, Hayes offered a bid on all of the Kaiser-Frazer door requirements at $9.66 per front door and $8.52 per rear door, upon the condition that Kaiser-Frazer expend about $550,000 for new equipment to be placed in the Hayes plant. On the day after receiving the Hayes bid Kaiser-Frazer contracted with Fleetwings to equip the Fleetwings plant for the manufacture of doors and deck lids, for which Fleetwings was to receive cost plus 10%. Between December 5, 1947, and October 25, 1949, when the settlement was consummated, Fleetwings manufactured 165,420 doors for which it was paid $18.30 each for 90,742 doors and $18.17 each for 74,678 doors. The Budd door at $12.00 per front door was stated by Hallett, general manager of Fleetwings, to be just as good as the Fleetwings door. On the day of the settlement agreement the price of the Fleetwings doors dropped to $12.00. The District Court considered that such a sudden drop on the very day of the agreement was a factor which rendered the transaction questionable.

Hayes bid on the deck lids at a net price of $5.90 each. Kaiser-Frazer gave the deck lids to Fleetwings to manufacture at a net price which varied from $8.75 to cost plus 10%. The net price of $8.75, which is higher than the Hayes bid, is lower than the price given Fleetwings under the cost plus arrangement. Fleetwings manufactured about 80,000 deck lids for Kaiser-Frazer and the difference between the price it received and the price bid by Hayes is around $228,000.

The court concluded that the deck lid transaction could not be questioned mainly because the Hayes product was unsatisfactory. The fact that Kaiser-Frazer again asked Hayes for a bid in December of 1947 is strong evidence to the contrary.

In addition to the expenditure for equipment and installation for the manufacture of doors by Fleetwings, Kaiser-Frazer spent approximately $300,000 for tools and dies for the deck lids. The same situation existed with reference to both doors and deck lids. The Kaiser interests, owners of Kaiser Fleetwings, profited greatly by the manufacture of both items at the expense of Kaiser-Frazer. Contracts under which these items would be made at much smaller prices by Hayes and the Budd Company were superseded by contracts with the Kaiser-owned corporation upon which over $1,000,000 additional was spent by Kaiser-Frazer for equipment and installation. The deals on both doors and deck lids were part of the same transaction, each bringing large financial benefit to the Kaiser interests. A substantial recovery on both items is probable and the amount probably recoverable is around $1,600,000.

### Graham-Paige

In December, 1946, Graham-Paige transferred to Kaiser-Frazer all its automotive assets. Kaiser-Frazer and Graham-Paige had been engaged in an automobile manufacturing enterprise under which Kaiser-Frazer leased the Willow Run plant near Detroit for their joint use, ⅔ for Kaiser-Frazer and ⅓ for Graham-Paige. The Kaiser interests then owned about 9% and Graham-Paige about 6% of Kaiser-Frazer. Frazer and his wife and daughter were heavily interested in Graham-Paige. Frazer was president of both corporations, a director of Kaiser-Frazer, and chairman of the board of directors of Graham-Paige. Edgar Kaiser was general manager of both corporations; Motter was director of both corporations; MacDonald, Bedford, and Price were vice-presidents of both corporations.

In the fall of 1946 Graham-Paige could not finance its third of production and a merger of the corporations was considered and rejected. It was then decided that Kaiser-Frazer should purchase the Graham-Paige automotive assets. Graham-Paige was to transfer all physical automotive assets, $3,000,000 cash to be obtained by loan, and an additional $1,250,000. Kaiser-Frazer was to pay Graham-Paige an amount to cover Graham-Paige's outstanding debentures upon maturity, together with interest at 4% until maturity, and to transfer to Graham-Paige 750,000 shares of Kaiser-Frazer stock at $6.50 per share. This was $3.50 less than the book value of the shares which was $10.00. On the date when the stock was transferred, the selling price was $9.75. The difference between the assets transferred to Kaiser-Frazer and the amount paid was adjusted to $2,714,000 and was covered in the exchange by so-called "intangible" assets acquired from Graham-Paige. The intangibles were claimed to include: (a) entire ownership of the automobile business formerly operated on a joint basis with Graham-Paige; (b) entire benefit of the dealer organization jointly used; (c) acquisition of patents, trademarks, and trade names of Graham-Paige and the good will of Graham-Paige automobile business; (d) acquisition of Graham-Paige distributor organization; (e) elimination of legal problems and troubles arising out of joint operation; (f) avoidance of legal questions in event of insolvency of Graham-Paige; (g) avoidance of disastrous effect of failure of Graham-Paige upon credit of Kaiser-Frazer. It is not asserted that any amount had been allocated to any of these intangibles on the books of Graham-Paige nor in the minutes of either corporation prior to the meeting of the board of directors held December 3, 1946, which considered and put through the sale of the automobile assets. At no point was the value of the claimed intangibles itemized. Bailey, an accountant of Kaiser-Frazer who had secured his position through Frazer, was very active in the negotiations, together with Walston S. Brown. Bailey conceded that the figure of $2,714,000 for intangibles was a mere bookkeeping adjustment. Brown said it was arrived at by calculating what Kaiser-Frazer would trans-

fer and then fixing the price for the intangibles to balance the figures.

As to the value of the listed intangibles Graham-Paige, in view of its lack of finances, could not use its right to the one-third capacity of the Willow Run plant. Brown conceded in effect that Graham-Paige could not assign this right which grew out of a joint venture. The RFC lease prevented assignment. Under the joint operating agreement Kaiser-Frazer already had a 100% right to use the plant since, owing to its financial difficulties, Graham-Paige could not.

A similar conclusion is necessitated with reference to the claimed intangible asset arising from the avoidance of the disastrous effect of failure of Graham-Paige upon the credit of Kaiser-Frazer. This involved no asset of Graham-Paige. It is error of law to consider that such claimed intangibles justify any substantial allowance in this transaction which was required to be based upon a fair valuation of the property of Graham-Paige.

Several of the other intangibles listed cannot under any theory be considered intangible assets for which Kaiser-Frazer should rightfully compensate Graham-Paige. The avoidance of legal complications in the event of Graham-Paige's insolvency was not a property right which Graham-Paige could sell to Kaiser-Frazer. If Graham-Paige's insolvency was imminent that insolvency would create no intangible asset.

Two other intangibles said to be taken over by Kaiser-Frazer are a dealer organization and a distributor organization jointly used and operated by the two companies but mainly financed by Kaiser-Frazer. On the undisputed testimony Kaiser-Frazer did not get the complete dealer and distributor organization in the separation of the companies. Graham-Paige took part of the dealer group for the sale and distribution of farm equipment, now its main business. During the course of the trial the District Court pointed out that there was no value in these claimed intangibles because the dealers had no place to go but to Kaiser-Frazer but they are included in the court's holding approving the valuation of all the intangibles.

The good will of the Graham-Paige automobile business, which was never evaluated on the books, is likewise questionable. The automobile operation had been going on for a little over a year, relatively few cars had been made, and good will in the automobile business had not been built up. As to the patents they were not considered important by Bailey. A prospectus of Kaiser-Frazer states that it is "not materially dependent upon patents." The entire record upon this point shows in fact that the intangibles had very little value and that the allowance of the $2,714,000 was, as Bailey said, purely a balancing transaction. The evidence requiring these conclusions came from witnesses adverse to the appellants.

The District Court found that there would probably be recovery on the undervaluation of the stock, 750,000 shares of which were sold at $1.62½ less than the current market price. This undervaluation would fairly give Kaiser-Frazer over $1,200,000. Moreover, Kaiser-Frazer paid par value for the debentures of Graham-Paige, which were selling on the market at 56. This was a loss of around $4,000,000.

In all, a reasonable recovery upon the Kaiser-Frazer stock and the intangible assets item would be $3,914,000. If a cause of action for the excessive price paid for the debentures were included, the recovery on this transaction might well be doubled.

The reasonable recovery in the Fleetwings and Graham-Paige matters might probably amount to $9,000,000. For these two transactions only the settlement was inadequate.

### Permanente

This cause of action attacks the transfer to Permanente by Kaiser-Frazer of the definitive letter of intent covering the Trentwood plant, an aluminum rolling mill which cost the Government $47,630,000 to construct and has a rated production capacity of 288,000,000 pounds per annum. This transaction grew out of the effort of the RFC and the War Assets Corporation

to sell to private industry aluminum properties which had been constructed by the Government for the war effort of World War II. The Government desired to set up integrated private operations in this field and both Permanente and Kaiser-Frazer had been in contact with those authorized to dispose of these and other plants, with a view to leasing them. Early in 1946, the War Assets Administration decided to lease the plant at Trentwood, Washington, to Kaiser-Frazer with an option to purchase. At the same time Kaiser Cargo, a Kaiser-owned corporation, had been issued letters of intent covering Baton Rouge, a plant for making alumina from bauxite, and Mead, a plant for converting alumina into ingots. Kaiser-Frazer decided not to undertake the manufacture of aluminum and requested from the Government authority to assign the Trentwood letter of intent to Permanente. Kaiser Cargo made a similar request as to Mead and Baton Rouge. The three letters of intent were assigned to Permanente. With no consideration except an assumption of the liability under the lease and a requirements contract for aluminum, the Trentwood lease was transferred to Permanente, of which the Kaiser interests then had 65% control and in which they had a much greater financial stake than in the Kaiser-Frazer corporation. The District Court declared in substance that if there was a probability of the Kaiser-Frazer stockholders obtaining a forced assignment of the Trentwood plant or of recovering damages in cash based on their idea of what would have been a fair percentage of Permanente stock to be received by Kaiser-Frazer, then the consideration specified in the settlement agreement was not enough.

The Permanente aluminum operation has been highly successful financially, netting over $8,000,000 in the first year of operation. Sales by Trentwood produce most of the profit from the aluminum venture.

The District Court held that the letter of intent covering Trentwood was a business opportunity of Permanente, not of Kaiser-Frazer, that the letter of intent had only doubtful value, and that the action had no merit. These conclusions involve errors of law.

The preliminary letter of intent did not constitute property; but the definitive letter of intent when accepted by Kaiser-Frazer became a binding contract under which Kaiser-Frazer had definite property rights. The original letter of intent for Trentwood was issued, not to Permanente but to Kaiser-Frazer. While for several years Permanente had shown interest in securing the Trentwood property, Permanente had acquired no legal right.

The District Court based its conclusion that there was no merit in the cause of action against Permanente largely upon the ground that it would have been illegal for Kaiser-Frazer to enter the aluminum business and would have been cause for stockholders' actions because the "use of proceeds" clause in the SEC prospectus covering the second issue of Kaiser-Frazer stock precluded it. The SEC did not consider this a serious objection. Its chairman suggested the amendment of Kaiser-Frazer's registration statement to cover the point but later agreed that no amendment was required in connection with the lease of the aluminum rolling mill. The War Assets Administration pointed out in its public statements on the matter that Kaiser-Frazer intended to use aluminum in the automobile business. It is a fair inference that the Government considered that the activity was covered by the broad Kaiser-Frazer charter. However, if what the Court calls the probable legal objections to Kaiser-Frazer's entering the aluminum industry were insuperable, the point is immaterial in evaluating the merits of the Permanente cause of action. Kaiser-Frazer had in its letter of intent a highly valuable asset. It turned over this asset to a corporation with interlocking directorates in which the Kaiser interests owned at that time 65% of the stock as opposed to 9% in Kaiser-Frazer. The directors were under an obligation to transfer this valuable property for a fair and adequate consideration and not to divert "possible benefits into their own pockets." Irving Trust Company v. Deutsch, supra, 73 F.2d 124. Whether Kaiser-Frazer decided to manufacture aluminum was a question for its own management but whether it could sell

the property of Kaiser-Frazer for an adequate consideration is the issue here. It transferred a contract covering a highly valuable plant merely for Permanente's agreement to take over the liability for the rent and upkeep of the property and to supply Kaiser-Frazer with aluminum. The contract with the Government provided that if the letter of intent was transferred to another party Kaiser-Frazer should not be liable under the lease. It follows that the assumption of liability by Permanente gave nothing to Kaiser-Frazer that it did not have. In the requirements contract the Kaiser interests secured an excellent market for Permanente aluminum at a controlled price which Kaiser-Frazer agreed to pay. In view of the complete domination of Permanente by Kaiser, this was hardly substantial compensation for the transfer.

But the District Court also held that the Government contract for the lease of the Trentwood plant had doubtful value. An expert witness compensated by Otis & Company testified to the contrary. Because of the speculative features of the case he declined to put a cash figure on its worth but said that a fair allowance in the transfer would have been 25% to 30% of the Permanente stock. The District Court held that this testimony was of no moment and concluded, "Mr. Chandler's expenses as a witness were admittedly paid by Otis & Co. and his testimony did not ring true."

Chandler's testimony was not disputed. Otis & Company held over ten thousand shares of Kaiser-Frazer stock and, prior to the date when the action was taken over by Pergament and London, had filed a stockholders' derivative suit in the Delaware Chancery Court questioning the Permanente transaction. Since it was proposed in the instant suit to cut off that cause of action, Otis & Company had a right to call an expert witness, to have him testify, and to compensate him in the usual way; and his testimony should have been considered by the court. Under the settlement Permanente agreed to pay $500,000, an arrangement which hardly indicates that the cause of action against Permanente has no merit. The finding that Kaiser-Frazer had no

property right in Trentwood is contradicted by the voluminous documentary record in the Permanente case and the undisputed fact of the binding character of a contract embodied in an accepted letter of intent. The finding of no value is disputed not only by Chandler but also by the inherent value of the lease. The transaction leaves one with a "definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Company, supra, 333 U.S. 395, 68 S.Ct. 542. This Permanente cause of action, as indicated by the District Court, makes the consideration for the settlement inadequate and its erroneous disposition requires that the compromise be disapproved.

The order of the District Court approving the settlement and dismissing the action should be vacated. The action should proceed as if no settlement had been offered or approved.

SIMONS, Chief Judge.

It is to be regretted, in view of the careful consideration given by Judge ALLEN to the long and involved record in the above case and to the numerous briefs filed therein, that Judge MILLER and I are not able to concur in the conclusion reached in the elaborate opinion originally prepared by her for the court, which must now be classified as a dissent. It becomes unnecessary, however, to review much of what has been said therein as to the origin of the litigation, the relationship of the parties and circumstances not controverted in the various transactions here challenged as being violations of a fiduciary obligation of the directors of Kaiser-Frazer Corporation to its shareholders. Nor have we any quarrel with its statement of the law which requires meticulous scrutiny of transactions between corporations having overlapping Boards of Directors and executive officers.

It has always been our view, however, that the principle governing responsibility for inequitable or illegal conduct is not to be applied in a vacuum but that those who complain of it must show that they were injured thereby, Columbia Gas & Electric Corporation v. United States, 6 Cir., 151 F.2d 461, 467, Glenn Coal

Company v. Dickinson Fuel Company, 4 Cir., 72 F.2d 885, American Steel & Wire Company v. Wire Drawers' & Die Makers' Unions Nos. 1 and 3, C.C., 90 F. 608. This leads us to the view that the crucial question in this derivative suit is whether the settlement arrived at between representatives of the stockholders and the corporate and individual defendants was, at the time and under the circumstances in which it was arrived at and considered by the District Judge, for the best interests of the Kaiser-Frazer Company. The District Judge, after thirteen weeks of trial and meticulous consideration of the evidence, so held, and, under familiar rules, we are not permitted to set aside his findings unless they are clearly wrong. In considering and in assaying the good faith and business judgment of the corporation's directors, we may not indulge in retrospective prophecy, or consider subsequent experience, for, as said in Taylor v. Standard Gas Company, 306 U.S. 307, 618, 59 S.Ct. 543, 550, 83 L. Ed. 669 (the Deep Rock case), "It is impossible to recast Deep Rock's history and experience so as even to approximate what would be its financial condition at this day * * *."

■ We must not forget that what was submitted to the District Court was a proposed settlement. A settlement is the result of a compromise and in effecting a compromise each of the parties expects to make some surrender, in order to prevent unprofitable litigation, effect upon its credit, the wasting of time on the part of its officers that should be devoted to the success of its enterprise and, so, compromises are generally approved by the courts. It was said in Winkelman v. General Motors, D.C., 48 F.Supp. 490, 496, "Judicial husbandry would support such a course where all the facts are known, and the claims and the persons involved are definitely ascertainable." Nor do we give consideration to the fact relied upon in the dissenting opinion, that by the proposed agreement some of the defendants do not contribute to the settlement. The general rule is that the release of noncontributing defendants is no reason for disapproving a compromise, Bysheim v. Miranda, Sup., 44 N.Y.S.2d 15,

30, Elmer v. Campbell, 136 Mo.App. 100, 103, 117 S.W. 622. The primary interest of the court in approving of a settlement resides in what the corporation receives in return for the grievances asserted by its stockholders in a derivative suit.

■ We attach no importance to the contention of the appellants, that the shareholders were not given adequate notice of the proposed settlement. Approximately a month before hearings began, a notice of the proposed settlement was sent to all the stockholders of Kaiser-Frazer which contained substantially its full text. Upon objection to the notice, the District Court, though satisfied that the original notice was complete, sought the consent of all parties to the wording of a new notice. The appellants refused to participate. Whereupon, the court prepared a second notice containing matters which appellants claimed should have been included in the original notice and this was sent to all stockholders, on December 20th. While the hearings were not resumed until January 17, 1950, no new stockholders thereafter appeared in opposition to the settlement, nor did any seek to intervene. In any event, it is not contended, nor does it appear, that the stockholders were not adequately represented by the present appellants, either at the hearing below or in its review on appeal.

■ We are not to be led into a discussion of the many contentions urged upon the court to the effect that the negotiators of the settlement on behalf of the corporation were not fully informed; that material information was concealed from them; that the lawyers participating occupied a dual role; or that there was no arm's length bargaining. The settlement agreement did not, and could not, become effective without the approval of the court under the mandate of Rule 23 (c). The District Judge was, therefore, a third party to the compromise. There is no contention, and there could be none, that in approving the compromise important information was concealed from him or that his participation in the settlement was subject to any infirmity. Every possible aspect of opposition was fully by him explored. In any event, he ruled against the objectors upon these mat-

ters upon the consideration of substantial evidence and in the exercise of a sound judicial discretion.

We come then to a consideration of the probabilities of recovery by the corporation of compensation claimed in the several class suits which were ordered dismissed, and the adequacy of the consideration for the wrongs alleged to have been committed by the directors in breach of their fiduciary obligations. In so far as they are found by the court to be well based, they are, of course, binding upon us and the respondents make no complaint.

The District Judge gave careful consideration to all nine claims upon which possible recovery might be had, and discussed them all in his opinion, 93 F.Supp. 13. Recovery was conceded probable in three of the claims and its probability denied in the remaining six. The appellants, while asserting merit to all of the claims, give particular discussion to but five and the dissenting opinion, without prejudice to the other claims, discusses, with particularity, but three. These relate to possible recovery in the transaction with Fleetwings, the purchase of the Graham-Paige assets and the assignment to Permanente of the lease to the Trentwood plant. We first take up the claim against Permanente, since it appears to be the principal claim relied upon by the objectors. The contention with respect to it is that there is strong probability of the corporation obtaining a reassignment of the Trentwood plant or of recovering very extensive damages.

The dissenting opinion accurately recites some of the circumstances under which a lease was obtained from the government for the Trentwood property, but does not give the whole picture. Henry Kaiser was interested in aluminum as early as 1940, when Permanente Metals was formed, and in 1941 had prepared an estimate for an aluminum plant in the Bonneville area, and Permanente had requested information from the government in 1944 with reference to Trentwood. After the war, the government sought to dispose of Trentwood, Mead and Baton Rouge to a financially responsible bidder who would operate an integrated aluminum business in competition with Al-

coa. On February 21, 1945, Husbands, its designated disposal agent, addressed a letter to fifty-seven firms engaged in the manufacture of non-ferrous metals soliciting their interest but received little encouragement, because the peace-time market for aluminum was unknown; there was a large surplus of prime and scrap and the competitive advantage of Alcoa seemed insurmountable. In August, Permanente employed Kaiser Engineers to conduct a study of the aluminum industry in contemplation of a fully integrated business with Trentwood and Mead. Husbands later wired Permanente and two hundred and twenty-five other firms to learn if they desired to purchase or lease government-owned aluminum or alumina plants. Only Permanente and Reynolds replied. Reynolds' answer was an offer to lease on terms which were not acceptable, whereupon, Reynolds refused to modify its offer, stating that the venture was a very great risk, with very substantial losses possible. In January, 1946, the Kaiser Engineers submitted the so-called Scheer Report which recommended against a venture into the aluminum industry. So did Permanente's chief engineer and a number of its directors. Pessimistic reports at the time were included in the Surplus Property Board's report to Congress, of September 21, 1945, and the Attorney General's Report, of September 11, 1945.

In January, 1946, Kaiser-Frazer ran into a shortage of sheet steel. While it had authorized experimental work on a number of aluminum bodies, steel was an immediate necessity and Kaiser advised that a bid by Kaiser-Frazer on Trentwood might improve the possibility of procuring steel from an established company. His suggestion to Frazer, to submit a proposal for Trentwood and the Mead plant, was turned down as to Mead. Frazer would go along with a bid on Trentwood only on the ground that it might better Kaiser-Frazer's trading position in procuring sheet steel. Price, treasurer and director, voiced similar argument to which he added that he objected to the whole venture because Kaiser-Frazer funds were barely enough for its automobile business, aluminum for cars was still ex-

perimental and the aluminum industry over-expanded. Scott, the corporation's attorney, felt that the prospectus just issued contained no indication of an intent to engage in anything not directly related to the automobile business. While the same objections were raised at a special meeting of the Board, the Trentwood lease was ratified but the company authorized to assign it to Permanente. On March 19, 1946, the directors of Permanente were induced to enter the aluminum business over the protests of three of its most important directors. Corey, Morrison and Kahn had been with Kaiser in many profitable enterprises but, being out-voted, resigned and sold their stock.

The so-called Browne Report was unknown to the Kaiser-Frazer directors. It could not, however, match Kaiser's optimism. Success was based on operation of Trentwood at 100% capacity,—at 60% it would show nominal profit and at 40% substantial losses. Sole reliance of objectors was the opinion of Chandler, employed by Otis, who would not put a dollar value on Trentwood at the time of assignment but estimated that consideration for it should have been 30% of Permanente stock together with a supply contract and the assumption of liability under the lease. Husbands, however, a director of RFC, president of Defense Plant Corporation, who had handled the actual negotiations for disposal of surplus properties for the Surplus Property Board, and primarily responsible for the disposition of government owned aluminum plants, deposed that it was a gamble for anyone to enter the aluminum field, that Trentwood was disadvantageously located, that the atmosphere at the close of the war was very grave as to the future, and that at the time the facilities of Alcoa and its connection with potential customers made the probabilities against the Trentwood plant being able to secure sufficient business for economic operations.

In the face of this gloomy prognosis, Kaiser plunged ahead and made a marked success of Permanente. This situation had faced the Kaiser-Frazer directors. It had a lease upon Trentwood for which it paid nothing. It had assumed substantial liability for rent. Its only purpose in acquiring Trentwood was as a leverage for obtaining sheet steel, with the alternative of securing aluminum, if it should prove to be practical. The latter purpose could be achieved by the conditions of its assignment. The experienced non-ferrous industries had evidenced no interest in Trentwood, and government policy was opposed to the peddling of surplus property by lessees. We are asked to find a fantastic value for the Trentwood lease based not upon what it was worth to Kaiser-Frazer, not upon market value, but upon a prophecy retroactively applied. It is novel doctrine with which we are unable to agree.

While the broad powers granted Kaiser-Frazer by its Charter may have permitted its manufacture of aluminum for the fabrication of automobile bodies, a venture into the general manufacture of such metal, integrated with plants other than Trentwood on the scale afterwards conducted by Permanente, poses a different problem. In the famous Ford dividend suit, Dodge v. Ford Motor Company, 204 Mich. 459, 498, 170 N.W. 668, 3 A.L.R. 113, wherein the authority of the Ford Company to build a blast furnace with undivided profits withheld from shareholders by failure to declare dividends was challenged, it was admitted that the defendant company might not undertake to smelt ore except for its own uses, and the court noted the distinction between the more limited and the broader authority. The Dodge case was a landmark in the development of the automobile industry and the entry of Kaiser-Frazer upon the general manufacture of aluminum may well have brought these very objectors, or other shareholders, into equity in an effort to prevent it. Moreover, Kaiser-Frazer never intended and never did get a right to any plants, other than Trentwood, necessary for an integrated aluminum manufacture. We perceive no possible recovery upon the claim based on the Permanente transaction.

Substantial recovery from Fleetwings, dominated and controlled by the Kaiser interests, is urged by the objectors as a probability because of excessive prices paid for the manufacture of deck lids and

doors, which prior to the Fleetwings' trans-actions had been furnished by Hayes at substantially lower cost, but Hayes did not do metal finishing and was behind on its schedules. Many of the deck lids had to be returned and the record shows that com-plaints as to their quality were so numer-ous as to be characterized as "chronic." The court concluded that there would be no liability on the deck-lid contract and that the directors were not guilty of any breach of duty with respect to it. It requires lit-tle familiarity with mass production tech-nique to know that every fabricated part of a motor car must be at its proper place on the assembly line in timed relation to its movement, that delay of any will stall the whole assembly process and might prove catastrophic. The finding, that there would be no probability of recovery on the deck-lid contract, is based on substantial evi-dence and is not clearly erroneous.

The court found limited recovery possible on the door contract. This was based upon the evidence, that the day the settlement agreement was signed Fleetwings had sub-stantially reduced its price. The objectors contend for a more optimistic view of re-covery but if the court was right upon the value of the consideration given for the settlement, any possible recovery on the door contract should not affect the deter-mination of the controversy.

Another possibility of recovery is based upon the transactions by which Kaiser-Frazer acquired all of the automo-tive assets of Graham-Paige, in considera-tion of 750,000 shares of Kaiser-Frazer stock @ $6.50 per share and the assump-tion of the liabilities of Graham-Paige. Kaiser-Frazer received the Graham-Paige automotive assets, which included machin-ery, equipment, inventory, trade-marks and good will, cash of $3,000,000, its working capital of $1,250,000, and intangible assets stated at $2,714,602. The alleged cause of action is based on the fact that the stock was assigned @ $6.50 per share at a time when its market value was $8.12½ per share with a book value of $10.00 per share; that the intangible assets had no value but was merely a balancing item, and that the $3,000,000 cash had to be borrowed from

the bank by a guaranty of Henry Kaiser and Joe Frazer on the security of the Kai-ser shares transferred to Graham-Paige, with the right to vote this stock in Kaiser and Frazer. The appellants argue that the purpose of this transaction was to secure to Henry Kaiser voting control over the additional 9% of Kaiser-Frazer stock with-out any expenditure on his part. The Dis-trict Judge found that the undervaluation of the stock might result in a recovery for the stockholders with damages limited, how-ever, to the effect on the market of putting 750,000 shares for sale at one time plus the cost of the underwriting, which might approximate $1.50 per share, and that the defendants, upon whom the burden of proof rested, failed to prove that the trans-action was fair and equitable. Blockage for purposes of evaluation of stock has been judicially approved, Groff v. Munford, 2 Cir., 150 F.2d 825. The court also found that while value of the intangibles could not specifically be determined, there was substantial value in the various items in-cluded in this category. It is common knowledge that an automobile manufacturer is only as good as his dealer and distributor organization. The elimination of Graham-Paige from the use of this organization and the acquisition of its control solely by Kai-ser-Frazer, was, undoubtedly, an asset of substantial value. It might, of course, fall to Kaiser-Frazer should Graham-Paige go out of the automobile business, but Gra-ham-Paige was still in it. It had had in the past a successful career as an automo-bile manufacturer and its good will had value. While it may not itself have been materially dependent upon patents, there was evidence that one of its patents, the hydraulic brake, had saved Kaiser-Frazer approximately $300,000 and that the pos-session of its patents was a protection against suits by outsiders. While the Frazer design, upon which Kaiser-Frazer very largely depended, had previously been acquired by it, there was still open a ques-tion, whether Graham-Paige could revoke its grant thereto. The elimination of the legal problems arising out of joint opera-tion was of substantial value, in the event of the failure of Graham-Paige. Its ad-

vertising, engineering and pre-production expenses had cost Graham-Paige over $800,000. They gave value to these assets. We are not convinced that the amount assigned to the intangibles was so clearly in excess of their value that recovery could be had in any amount determinative of this controversy.

The court found no merit in the cause of action based upon manipulation and stabilization of the Kaiser-Frazer stock, in preparation for a new issue to the public of 1,500,000 shares of Kaiser-Frazer stock through three underwriters, including Otis & Company. The proposed issue was to obtain needed funds to expand production to 1500 cars per day, and for plant additions and improvements. Kaiser-Frazer was advised by Eaton, of Otis & Company, that this could be done by stabilizing the market @ $13.50 per share while it was expected that the new stock would be sold @ $13.00 per share. This claim is not discussed in the dissenting opinion, but it must be considered in view of the events that have happened since the case was tried and reviewed. Kaiser-Frazer Corporation was advised by Eaton that the stock could be stabilized @ $13.50 by the purchase of not more than a small number of shares and the S.E.C., upon being consulted, saw no violation of Sec. 9(a)(2) of the Securities Exchange Act, 15 U.S.C.A. § 78i (a)(2). Since then, it has been brought to our attention that under criticism of the S. E. C. by a subcommittee of the Committee on Interstate and Foreign Commerce, 82d Congress, dated September 5, 1952, the S. E. C. states categorically that the Commission and its staff were imposed upon and misled with respect to the Kaiser-Frazer registration statement, so that it is now contended by the appellants that the registration by Kaiser-Frazer of its proposed new stock issue was illegal and that the directors of the corporation are liable to it for the entire sum expended in the purchase of 186,000 shares of its stock in order to stabilize it @ $13.50 per share, less their salvage value, and that reliance upon the original approval of the S. E. C. colored all the other findings made by the District Judge in the case. With the second contention, we are unable to agree. The court made detailed and exhaustive study of the circumstances bearing upon each of the alleged causes of action. There is nothing in the record to show that, with respect to them, it was influenced by the approval of the S. E. C., for approval by S. E. C. had no bearing on any of them. As to the first contention, it must be noted that the transaction is devoid of any conflict of interest between overlapping directors. Otis & Company, and the other underwriters were not represented upon the Board of Kaiser-Frazer.

Whatever may have been the view of the S. E. C., reached under the promptings of the Congressional Subcommittee, that the report of Kaiser-Frazer's earnings for the month of December, 1947, was misleading, it must be noted that it was arrived at under criticism and without a hearing accorded the appellees. There has been no judicial finding, that a stabilization program, in and of itself, is violative of Sec. 9(a)(2) of the Securities Exchange Act of 1934. The District Court for the Southern District of New York, in its unreported opinion, had held there was no violation. The opinion of Judge Hand, Kaiser-Frazer v. Otis & Company, 2 Cir., 195 F.2d 838, April 7, 1952, reversing the judgment of over $3,000,000 against Otis, reversed not on the ground that stabilization is illegal but on the fact that the table summarizing earnings failed to make full disclosure therein of all the facts and, so, constituted a breach of the contract with Otis, that any sale to the public by means of a misleading prospectus would have been a violation of the Securities Act of 1933, 15 U.S.C.A. § 77l(2). He held that the prospectus formed an integral part of the contract and the public sale of the stock by the underwriters could only have been made in reliance upon it, even though concededly the profits for the year, as a whole, were substantially unaffected by the overstatement of December, 1947, earnings. It must be noted, however, that none of the new shares were delivered and the few that were sold were sold conditionally. The whole project fell through, Final Report of Securities & Exchange Commission's Subcommittee, (1952

p. 66). If bad faith was involved in the registration statement, the Act provides the Commission with adequate corrective powers. The primary obligation of the S. E. C. is to protect investors and none were injured.

[redacted] The purchase by a corporation of its own shares is not, in itself, illegal. The stabilization of the market for its shares is not in and of itself illegal. Assuming that the purchase of its shares @ $13.50 in preparation for an issue of new stock @ $13.00 was improvident, some recovery may be foreseen. The immediate injury was measurable by the difference between what was paid for the old shares and the selling price of the new. Subsequently, the market substantially receded. It is impossible to forecast the ultimate injury to the corporation and its stockholders. There may be no salvage value for the shares when trial is had upon this claim, or there may then be no loss. While we think that the court was in error in assigning no recovery upon this transaction, the amount of recovery is so uncertain that the claim asserted by the objectors can have no substantial effect upon the fairness of the compromise.

[redacted] We come then to an appraisal of the consideration for the settlement and here we must remember that this is not a case for setting aside an executed agreement entered into through breach of fiduciary obligation. The settlement agreement was of no effect without the approval of the court and in passing upon its fairness every angle of the controversy was fairly explored with findings made upon evidence which the court in the exercise of its judicial discretion had an opportunity to evaluate. The consideration found to be adequate to sustain the settlement included three elements: the payment by the Kaiser interests of $500,000 in cash, the purchase of presses belonging to Kaiser-Frazer but in the possession of Fleetwings at their depreciated book value, and the guaranty by Kaiser of $15,000,000 of a RFC loan of $44,000,000 with a deposit by Kaiser of $10,000,000 of collateral as security.

As to the $500,000 payment, there can be no controversy as to its constituting a valuable consideration. As to the presses, the facts are that they were supplied to Fleetwings under retention of title at a cost of $950,750. The settlement agreement provided for Fleetwings to pay Kaizer-Frazer $817,503 which was the depreciated book value of the presses. They had a recoverable value at the time of $560,000. It is doubtful that if they had been recovered by Kaiser-Frazer, at a later date, they would have had such value. It is quite true, of course, that Fleetwings was already negotiating with the Metropolitan Life Insurance Company for a loan under which Fleetwings was required to file a chattel mortgage covering the presses. It is argued that there was an option under which Kaiser-Frazer was obligated to buy back the presses if Fleetwings so desired but this would have been at a further depreciated value at a later time. It is not true, however, that the agreement was of no benefit to Kaiser-Frazer. As we shall presently show, in viewing another aspect of the consideration, Kaiser-Frazer was in extremis. In that situation it was receiving nearly $900,000 in addition to the $500,000, an important benefit to it at the time, notwithstanding a hazard in an option which might never be exercised, or, if exercised, it would be at a time when it was better able to repurchase. Its immediate need of funds was paramount.

We come finally to an evaluation of the Kaiser guaranty in the circumstances disclosed by the record. At the time of the settlement, October 25, 1949, Kaiser-Frazer was in desperate financial difficulties. Its production had ceased, its labor force was laid off, its effort to raise money by stock issue had proved futile, the sellers' market was gone and the corporation in desperate need of money for new models and the tools and dies therefor. It could not continue operations without new financing. These facts were undisputed. The obtaining of the RFC loan was vital to its continuance. It owed the Mellon and Giannini banks $16,000,000, on a short-term loan, already in default. By its terms, the right of subrogation was immediate. It is true that the Kaiser interests had guaranteed this loan and were greatly restricted

336

in their operations by its terms yet the possibility of loss to them was negligible and there were sufficient assets for them to recoup if Kaiser-Frazer were forced into liquidation. On the other hand, the proposed RFC loan was for a ten-year period, the first payment thereon not due until July 1, 1951; that it could not be obtained without the guaranty, and the guaranty could not be had unless the stockholders' suits were settled. The court held that the loan was of tremendous value, that it meant the difference between failure and a fighting chance, that continued litigation with its uncertain results, with its cost in time, money and reputation threatened its very existence. There was in evidence a letter from an underwriting firm which represented Lloyds of London evaluating the Kaiser guaranty, expressing an opinion that the fair and reasonable premium for writing a bond of this character by anyone willing to undertake such an obligation would be not less than 2.5% per annum, which over the ten year period of the loan would aggregate not less than $3,750,000. It did not suggest that Lloyds would give such bond. Bailey, the senior partner in a firm of reputable accountants, testified that the value of the guaranty was one-fifth to one-fourth of the common stock of Kaiser-Frazer, which would amount to approximately $20,000,000. Bailey was sworn as an expert and vigorously cross examined. The District Judge was not obliged to accept at face value either estimate of the value of the guaranty but it was not an abuse of discretion nor a demonstration of clear error, under all of the evidence, for the court to conclude that the RFC loan meant the difference between continued existence and a liquidation that would have been a complete loss to the stockholders. Excluding recovery on the transaction with Permanente, and other claims, we are not convinced that the guaranty of the Kaisers was not in itself an adequate consideration for the settlement.

We are forced to reject the argument made by the appellants, based upon the subsequent history of Kaiser-Frazer, that the corporation would have been better off if it had not sought the RFC loan, just as we rejected a similar argument in Columbia Gas, Etc. v. United States, supra. There, it was contended that the American Fuel System, which had been prevented access to wider markets in the building of a pipeline to Detroit, foiled by inequitable conduct of Columbia, may have failed in its project even if Columbia had kept its hands off. In answer, we said [151 F.2d 469]: "The hope that the debtors, their public creditors and the Syndicate may have had in the success of the Detroit project, was one they had a right to entertain. If realized, American Fuel would not have been the first company saved from disaster by improved management and access to an expanded market." The chance to live, and not Trentwood, was Kaiser-Frazer's opportunity, even though it should ultimately fail,—and it may not fail.

Giving full consideration to all the circumstances disclosed by the voluminous record in the case, the many arguments presented orally and in the briefs, and the post-hearing communications to the court, we are unable to conclude that the District Judge was clearly erroneous in his major findings, or abused his discretion in his ultimate conclusions.

Affirmed.