BUCK v. NORTHERN DAIRY COMPANY.

CORPORATIONS—CONTRACTS—DISINTERESTED DIRECTORS—EQUALLY DI-
VIDED COURT—SPECIFIC PERFORMANCE.

Decree holding valid and requiring specific performance of a contract to pay 78-year-old plaintiff, a former director of defendant corporation, the sum of $150 monthly for life, guaranteeing payments for 6 years to plaintiff or his estate, made incident to purchase of his stock in defendant corporation at a meeting of the 7 directors that was supported by the vote of a majority of disinterested directors, such agreement continuing similar arrangements of 17 years' duration and requiring monthly payments of $187.50, is affirmed by an equally divided court (CL 1948, § 566.1).

Appeal from Marquette; Rushton (Carroll C.), J. Submitted October 14, 1960. (Docket No. 90, Calendar No. 48,464.) Decided September 22, 1961.

Bill by Samuel H. Buck against Northern Dairy Company, a Michigan corporation, for specific performance of contract to pay monthly retirement annuity. Cross bill for return of sums previously paid. Decree for plaintiff. Defendant appeals. Affirmed by an equally divided court.

REFERENCES FOR POINTS IN HEADNOTES
3 Am Jur, Appeal and Error § 1160.

*Waldo A. McCrea,* for plaintiff.

*Baldwin & Kendricks* (*Roscoe W. Baldwin,* of counsel), for defendant.

Dethmers, C. J. (*for affirmance*). Defendant appeals from decree for specific performance of a contract to make monthly payments to plaintiff.

Plaintiff had owned the Buck Dairy. In 1938 he merged it with the Northern Dairy Company and the defendant corporation resulted therefrom. He became its vice president and general manager. On April 10, 1939, defendant gave plaintiff a contract employing him as special consultant at a salary which, from September 1, 1939, until his death, was to be $187.50 per month. Plaintiff, in turn, agreed to give up his position as general manager, to advise and consult with defendant's officials and agents when requested, and to refrain from having connection with any competition of defendant. At that time plaintiff owned 450 of defendant's 1,750 outstanding shares. In 1943 the agreement was modified, relieving plaintiff of consultant duties but continuing his other obligations thereunder and his right to be paid $187.50 per month for life. This monthly payment defendant continued to make to plaintiff until August of 1956.

By the latter date, plaintiff owned 540 shares in defendant company and was a director and president of the company. He was 78 years of age. Difficulties had arisen between him and other officers and the manager of defendant. The manager resigned, in consequence, but other directors persuaded him to stay on. The troubles led to the conclusion by the other directors that it would be to the benefit of the corporation to obtain plaintiff's stock and get rid of him in the operation of the company. Director Paul secured an option to buy plaintiff's stock at $90,

per share, but it was never exercised. Later Director Overholt secured a like option at $70 per share, containing a condition that defendant was to pay to plaintiff $150 per month for the rest of his life and, in case of his decease in less than 6 years, then for the balance of the 6 years to his estate. At a meeting of the board of directors, with all 7 of its members present, this situation was thoroughly discussed. Then, with plaintiff and 1 other director abstaining from voting, a resolution was adopted by the unanimous vote of the other 5 directors, approving the payment to plaintiff provided for in said option. They all understood that this was for the purpose of consummating the option deal and bringing about plaintiff's sale of his 540 shares. Pursuant to and as empowered by that resolution, defendant's officers executed a formal agreement in August of 1956 for the making of such payments to plaintiff. Defendant made such payments accordingly for 26 months. Overholt exercised the option, plaintiff assigned the stock, and, 2 years later, those and other shares, representing a controlling interest in the company, were transferred to another corporation, the Soo Creamery. Officers of the latter, at the time of its stock purchase, knew of the agreement with plaintiff. A few months later plaintiff received a letter from a firm of attorneys advising that in their opinion his contract with defendant was void and that they were authorized to inform him that defendant would make no further payments thereunder and was demanding return of the 26 payments already made. Plaintiff then commenced these proceedings for enforcement of the agreement. Defendant filed an answer denying liability and a cross bill praying for such repayment.

Defendant contends that a contract between a corporation and a member of its board of directors depends for its validity on authorization by a majority

of the corporation's disinterested directors and on
being a fair and honest dealing with the corporation,
the burden of proving the latter resting on the party
attempting to uphold the contract. For the former
point defendant cites *Veeser* v. *Robinson Hotel Co.*,
275 Mich 133, and for the latter several other cases,
such as *Garwin* v. *Anderson*, 334 Mich 287; *Miner* v.
*The Belle Isle Ice Company*, 93 Mich 97 (17 LRA
412); and *Wiseman* v. *Musgrave*, 309 Mich 523.

As already noted, the resolution authorizing the
agreement was approved at a directors' meeting,
with all 7 members present, 5 voting for it, none
against it, and 2 abstaining. Defendant says, how-
ever, that of the 5 voting for it 3 were not disin-
terested. Overholt held the option, which was con-
ditioned on the agreement being made. Defendant
says that Overholt also held options on the stock of
the other 2 directors, who knew he would not exercise
them unless he could get plaintiff's stock. The trial
judge apparently did not think, and the record does
not persuade us, that those 2 would profit from their
vote other than as they thought the interests of de-
fendant corporation, and, hence, the value and de-
sirability of their stock, would be enhanced by getting
rid of plaintiff. They all testified that that had been
their judgment. Such interest in the matter and
motive on the part of a director is not so incompatible
with the best interests of the corporation as to render
the directors' action with respect thereto prejudicial
to the corporation or its other stockholders and,
hence, invalid. It appears, therefore, that the resolu-
tion had the support of a majority of the disin-
terested directors within the meaning of *Veeser*.

We consider now defendant's contention that plain-
tiff did not sustain the burden of proving the contract
fair to the corporation and its minority stockholders.
Since the agreement of 1939 until August of 1956,
defendant had considered plaintiff entitled to and

paid him $187.50 per month. This he was to receive for the rest of his life. By the 1956 agreement here in question that amount was reduced to $150 per month. True, the new agreement guaranteed such payments for not less than 6 years, but his life expectancy then was in excess of 5 years. These facts hardly disclose bad faith or breach of fiduciary relationship on the part of directors voting to substitute for the agreement to continue monthly payments for the rest of plaintiff's life another to pay for the balance of his life but not less than 6 years the smaller monthly sum. On the question of existence of a valid and sufficient consideration to support defendant's 1956 agreement to pay plaintiff $150 per month, substituted for the agreement of 1939 as modified in 1943, see the statement in *Jacob v. Cummings,* 213 Mich 373, to the effect that the fact that the parties considered it to their advantage to change from the original to a different agreement is sufficient consideration to support the latter. See, also, CL 1948, § 566.1 (Stat Ann 1953 Rev § 26.978 [1]), as to validity of the latter agreement even if consideration is found to be lacking. The 1939 and 1943 agreements were fully known to the directors and payments thereunder were made regularly for 17 years without protest or objection from anyone. Payments under the 1956 agreement were made for 26 months with full knowledge of the directors, including, for the latter part of that period, those representing the new, present ownership, in office at the time of this suit. We think fairness of the agreement to defendant adequately appears.

The defenses of illegality* of the 3 contracts or lack of authority in the directors to make them seem to us answered in *Good* v. *Modern Globe, Inc.,* 346 Mich 602. At all events, such defenses are affirmative and must be pleaded. *Wachsmuth* v. *Merchants Na-*

---

* See Court Rule No 23, § 3 (1945).—REPORTER.

*tional Bank,* 96 Mich 426 (21 LRA 278) ; *Blackwood* v. *Lansing Chamber of Commerce,* 178 Mich 321. They were not pleaded here but, so plaintiff says without contradiction, were raised for the first time in defendant's trial brief. They are not entitled, therefore, to be considered here.

See *Union Trust Co.* v. *Electric Park Amusement Co.,* 163 Mich 687, and *Burtch* v. *Child, Hulswit & Co.,* 207 Mich 205, holding that unauthorized acts of its agents must be repudiated within a reasonable time to be avoided by a corporation. Here defendant, with its present directors who were fully informed thereof and could not personally benefit therefrom, has ratified the agreement by payments thereunder. There is no showing of prejudice to or objections on the part of the other stockholders.

Affirmed. Costs to plaintiff.

CARR, KELLY, and BLACK, JJ., concurred with DETHMERS, C. J.

SOURIS, J. (*for reversal*). Dr. Samuel H. Buck, plaintiff, was president and a director of Northern Dairy Company, defendant and appellant. He owned 540 of the 1,750 shares of defendant's outstanding capital stock. The balance of the stock was owned by 62 other stockholders, a large proportion of whom owned less than 20 shares each and, as a consequence, Dr. Buck's ownership of the block of 31% of the stock resulted in his having working control of defendant corporation. In August of 1956, simultaneous with the sale of his controlling block of stock to a fellow director, Dr. Buck entered into a "retirement annuity agreement" with defendant corporation whereby defendant agreed to pay an "annuity or pension" of $150 per month to Dr. Buck for life and, if he should die within 6 years, to his estate until the expiration of 6 years from the

date of the agreement so that a minimum of $10,800 would be paid. Upon execution of the agreement and sale of his stock, Dr. Buck resigned as president and director of defendant, and payments were thereafter made to him by defendant for a period of 26 months for a total of $3,900.

In the meantime, in June of 1958, the Soo Creamery of Sault Ste. Marie purchased the block of stock formerly owned by plaintiff from the director to whom he had sold it and acquired sufficient other shares to give it absolute control of defendant. "Annuity" payments to Dr. Buck were continued for several months after the Soo Creamery acquired control of defendant and then were stopped. Dr. Buck instituted this bill in equity for specific performance of the agreement, and defendant filed its cross bill seeking the return to it of the $3,900 already paid to plaintiff under the agreement. Defendant claimed, based upon pleadings in its answer and in its cross bill of complaint, that the agreement was void because, plaintiff being then a director of defendant, the agreement was not authorized by a disinterested quorum of defendant's board of directors and because the payments required to be made thereunder were in fact a part of the purchase price for plaintiff's block of control stock for the benefit of plaintiff and the purchasing director at the expense, and to the detriment, of defendant corporation and its remaining stockholders. Plaintiff countered by claiming that the majority of the board of directors voting in favor of the retirement annuity agreement was disinterested and that the agreement was a fair one to the defendant corporation. The chancellor denied defendant the relief sought in its cross bill and ordered specific performance of the agreement.

Relying upon *Veeser* v. *Robinson Hotel Co.,* 275 Mich 133, defendant takes the position that the agree-

ment is void, not merely voidable, because not authorized by a disinterested quorum of its board of directors and that this result would follow even if the agreement were otherwise fair to the corporation. Such, indeed, was the holding in *Veeser* v. *Robinson Hotel Co.,* where this Court said (pp 137, 138):

"The rule which permits a director of a corporation to deal with it, even in good faith, is limited to those cases where the corporation is represented by a quorum of disinterested directors or other independent officers or agents authorized to contract for it."

The Court had before it, in the *Veeser Case,* section 13, subd (5), of PA 1931, No 327 (now CLS 1956, § 450.13, subd (5) [Stat Ann 1959 Cum Supp § 21.13, subd (5)]),[1] and it was the rule set forth in that statutory provision which this Court so limited. If the language of the *Veeser* opinion were literally applied as defendant urges upon us, the familiar family owned corporation (the stock of which frequently is owned by husband and wife, both serving on the board of directors, with their attorney as the third director, and the husband serving also as president and operating manager) legally would be unable to authorize and pay compensation for its president's services no matter how fair the amount might be. It goes without saying, therefore, that no member of the family controlling the corporation legally could risk dealing with it in other matters, such as

---

[1] "No contract of any corporation made with any director of such corporation or with a partnership or other group or association of which any such director shall be a member or with any other corporation of which such director may be a member or director and no contract between corporations having common directors shall be invalid because of such respective facts alone. When the validity of any such contract is questioned, the burden of proving the fairness to the contracting parties of any such contract shall be upon such director, partnership, other group or association, or corporation who shall be asserting the validity of such contract."

by selling or leasing real or personal property to or from it regardless of the advantages which might inure to the corporation's benefit therefrom. From the typical family owned corporation, we move to the corporation all of the stock of which is held by several otherwise unrelated owners and thence to the corporation a majority of the stock of which, or a controlling block of the stock of which, is owned by 1 person and the balance spread out in the hands of a few or many. It is this latter situation with which we are confronted in the case at bar.

 We can see no reason for so limiting the operations of such corporations when the statutory rule of fairness properly can be read to protect the corporation, its minority stockholders and its creditors.[2] Whether or not a disinterested quorum of directors approves a transaction between the corporation and a director or a partnership, association or other corporation having common members or directors, the statute imposes the burden of proving fairness to the corporation upon the other party to the transaction whenever its validity is questioned. Indeed, we have not followed the literal language of *Veeser*. Prior decisions of this Court have considered the fairness of contracts authorized for corporations by boards of directors not disinterested therein. See *Wiseman* v. *United Dairies, Inc.*, 324 Mich 473, 492, 493. Such cases have substantially reduced the vitality of the opinion in *Veeser* v. *Robinson Hotel Co.* See, also, *Pergament* v. *Frazer* (ED Mich), 93 F Supp 13, 23, affirmed *sub nom, Masterson* v. *Pergament* (CCA 6), 203 F2d 315. To

---

[2] Indeed, if the principle of the *Veeser Case* is applied to contracts between corporations having common directors (*e.q.*, parent and subsidiary corporations where, not infrequently, a majority of the members of one board serve on the board of the other), would we not be compelled to say such contracts are likewise void (not merely voidable) regardless of their fairness to each corporation?

the extent *Veeser* has not been overruled already, we do so now.[3]

Defendant corporation's claim that the agreement was invalid did not rest alone upon the claimed absence of a disinterested quorum of directors. Defendant also claimed in the trial court and before us that the agreement for the payment to plaintiff or his estate of an annuity for life or for a minimum of 6 years was unfair to the corporation because (1) there was no consideration flowing to the corporation therefor, and (2) the agreement constituted part payment to plaintiff for his block of control stock and should not have been made from corporation assets. We think the record supports both grounds for defendant's claim of unfairness.

In 1939 an agreement was executed between the parties hereto whereby defendant agreed to pay plaintiff $187.50 per month, which payment was described as a salary for advisory and consulting services, but which payment was to be reduced by the amount of dividends paid plaintiff on the 450 shares of defendant's capital stock then owned by him. Significantly, the agreement was to terminate upon transfer by plaintiff of all of said stock, and it provided that his "salary" was to be reduced 42¢ per month for each share of stock, less than all, so transferred. Other provisions of that agreement are not material to the problem being considered. In any event, in 1943 an amendment was made in which the 1939 agreement was described accurately as assuring plaintiff at least $5 per share per year on the defendant's capital stock owned by him. The 1943 amendment relieved plaintiff from any obligation to act as a special consultant under the earlier agreement

---

[3] For an interesting and enlightening review of the common law and statutes enacted in several States concerning these problems, see comment at 23 Cornell L Q 445.

and defendant company reaffirmed its "obligation" to pay plaintiff in the following words:

"Said party of the first part hereby continues, however, to guarantee to the said party of the second part, an annual return of at least $5 per share on all shares of stock held by him in said corporation."

We reject plaintiff's suggestion that the 1956 "retirement annuity agreement" merely substituted an obligation on defendant's part to pay plaintiff $150 per month for life for a prior obligation to pay him $187.50 per month for life. As noted above, the parties themselves in 1943 described the 1939 "agreement" in words which really meant that plaintiff was guaranteed (whether legally or not is unimportant to our decision) a $5 dividend on his common stock. Furthermore, by the express language of that agreement and of the 1943 amendment, any "obligation" of defendant would terminate upon plaintiff's transfer of all of his stock. In other words, but for the "retirement annuity agreement" executed in 1956, as soon as plaintiff sold his block of control stock defendant would have been free of all obligations to plaintiff. If there were any justification for that agreement from defendant's standpoint, it must be found other than in the prior agreements.

Plaintiff next contends that the "retirement annuity agreement" was fair to defendant because defendant was thereby enabled to rid itself of him and thereby to effect changes in defendant's management policies. Having said this much, plaintiff has conceded that part of the purchase price for his block of control stock was the $150 per month payment from defendant corporation. The record indicates clearly that it was so regarded at the time of the transaction and yet, all of plaintiff's shares so purchased went to Harold C. Overholt, then also a member of defendant's board of directors who sup-

plied the balance of the purchase price. None of plaintiff's stock was acquired as treasury shares or otherwise by defendant in exchange for the $150 per month agreement we are now told was part of the purchase price for the stock.

The record itself discloses the use of defendant's agreement by plaintiff and Mr. Overholt to effect their transfer of control of defendant from the former to the latter. Prior to August, 1956, plaintiff had given Joseph Paul, another member of defendant's board, an option to purchase his block of control stock at $90 per share. The price at which small quantities of defendant's shares had been traded immediately before and after the transaction here involved was $75 per share. It is more than a fair inference, therefore, that the $15 per share difference between the current market price and the Paul option price was the price set by plaintiff for working control of defendant represented by plaintiff's large block of its stock. For reasons not disclosed by the record Mr. Paul did not exercise his option, but shortly thereafter Mr. Overholt secured an option from plaintiff to purchase his entire block of stock at $70 per share. Significantly the Overholt option agreement specifically provided that:

"This option is granted upon the express condition that the said Harold C. Overholt shall cause the said Northern Dairy Company to agree in writing with the said Samuel H. Buck to pay him an annuity or pension in the amount of $150 per month to continue so long as the said Samuel H. Buck shall live; and with the further provision that should the said Samuel H. Buck die within 6 years from the date of the exercise of this option the said annuity or pension shall continue to be paid at the rate of $150 per month to the estate of the said Samuel H. Buck for the full period of 6 years from and after the date of the exercise of this option so that in any event

the sum of $10,800 shall be paid under said annuity or pension provision. Monthly payments of said annuity or pension shall begin 30 days following the exercise of this option."

It seems hardly likely that the minimum "annuity" of $10,800 imposed upon defendant corporation was coincidental to the mathematically computable difference of $10,800 between Paul's option price of $90 per share for 540 shares and Overholt's option price of $70 per share.

Mr. Overholt also acquired options for additional shares of the defendant's stock owned by others, including Mr. Paul and Lionel Trepanier, still another director. These options were exercised at the same time the option on plaintiff's stock was exercised. On August 16, 1956, at a board of directors' meeting, a resolution authorizing the "retirement annuity agreement" was adopted by the favorable votes of directors Overholt, Paul, Trepanier and 2 others, while plaintiff and 1 other director abstained from voting. Mr. Paul testified that "it was generally understood" that the plaintiff's stock sale and the annuity agreement "would have to go together."

A somewhat similar factual situation was presented to this Court in *Good* v. *Modern Globe, Inc.*, 346 Mich 602. There, plaintiff sold 7,000 shares of defendant's stock (whether enough to represent actual or working control of the corporation is not disclosed in the opinion) for $50,000 at a time when its shares had a market value of approximately $7 per share. Plaintiff was president and 1 of defendant's 9 directors and the stock was purchased by 4 of the remaining 8 directors. Simultaneous with the transfer of the stock, defendant's board of directors authorized a 5-year contract with plaintiff whereby he agreed to render consulting services to the corporation, not to compete with it during the term of the contract and to serve as chairman of the corpora-

tion's board of directors if elected to that office, in exchange for which plaintiff was to be paid $500 per month for his services. Subsequently, as in the case at bar, actual stock control of defendant was acquired by another company and 2-1/2 years after the inception of the contract payments to plaintiff ceased. Mr. Good brought suit for damages and, among other defenses, it was claimed he breached his fiduciary duty as a director of defendant in entering into the contract with it and that 4 of the other directors were not disinterested in the contract when they authorized it at the board of directors' meeting because they were the purchasers of the stock from plaintiff for a reduced price in exchange for their using their powers as directors to give him the benefit of the contract. This Court upheld the validity of the contract on the ground that plaintiff had borne his statutory burden of proving its fairness, as to which there was ample proof in the trial below including proof of plaintiff's actual performance of services as a consultant and as board chairman for 2-1/2 years.

There are significant differences between that case and the case at bar. Here, we have an express agreement by a stockholder-director to "cause the said Northern Dairy Company to agree in writing" to pay Dr. Buck an annuity. As to the validity of such agreements whereby independent judgment and discretion as a stockholder or director are bartered for a private consideration, see *Brewer* v. *Stoddard*, 309 Mich 119, and cases cited therein. Whether or not there was an implied agreement between Mr. Good and the 4 purchasing directors to cause their corporation to hire him as a consultant does not appear from the opinion of the Court and apparently no such implied agreement was proved.

The fact that Dr. Buck's "retirement annuity agreement" would produce to him or his estate a

minimum of $10,800, equivalent to the difference between the purchase price stated for his stock and the value thereof he had previously established in the Paul option, is likewise obviously significant. There was no similar correlation proved in *Good* v. *Modern Globe, Inc., supra,* nor may one properly be implied.

Finally, Mr. Good's contract with Modern Globe, Inc., was an employment contract calling for the performance by him of future services and containing a covenant by him not to compete with the corporation during the term of his contract, whereas Dr. Buck's agreement with this defendant provided only for payment to him of a pension for past services only. It should be noted that we are not here dealing with a corporate pension awarded to employees or officers during their employment for future payment upon retirement. We deal with a pure gratuity.

The circumstances detailed above from the record presented to us would have supported a chancellor's finding that the agreement relied upon by plaintiff for which specific performance is sought was not fair to defendant corporation and was not, therefore, entitled to enforcement. Hearing chancery matters *de novo,* as we do, we so find.

When a director contracts with the corporation he serves, whether for compensation for services or otherwise, his conduct must be measured by the most exacting standard of fairness to the corporation, and he must be prepared to prove he met that standard of fairness whenever challenged to do so. Plaintiff has failed to carry this burden, and, consequently, we find the agreement between him and defendant to be invalid.

The decree for specific performance should be reversed, and this cause should be remanded to the circuit court for entry of a decree on defendant's cross bill awarding defendant the sum of $3,900,

heretofore paid by defendant pursuant to the invalid agreement, plus interest. Costs to defendant.

TALBOT SMITH, EDWARDS, and KAVANAGH, JJ., concurred with SOURIS, J.